No. 26-5836

IN THE

# United States Court of Appeals for the Sixth Circuit

APPALACHIAN VOICES; CENTER FOR BIOLOGICAL DIVERSITY; and SIERRA CLUB,

*Plaintiffs–Appellees*,

*v.*

TENNESSEE VALLEY AUTHORITY,

*Defendant–Appellant*.

On Appeal from the United States District Court for the Eastern District of Tennessee, Knoxville Division, No. 3:24-cv-00411-CLC-DCP

## TENNESSEE VALLEY AUTHORITY'S EMERGENCY MOTION FOR STAY PENDING APPEAL AND TEMPORARY ADMINISTRATIVE STAY

Nash E. Long
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
nash.long@bakerbotts.com

Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1234
beau.carter@bakerbotts.com

Maria V. Gillen
F. Regina Koho
Lane E. McCarty
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Dr.
Knoxville, Tennessee 37902-1401
(865) 632-7741
mvgillen@tva.gov

*Counsel for Tennessee Valley Authority*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

LIST OF EXHIBITS ........ vii

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 3

I. Legal Background ........ 3

II. Factual Background ........ 4

STANDARD OF REVIEW ........ 7

ARGUMENT ........ 8

I. TVA is likely to succeed on the merits. ........ 8

A. The district court's reasonable-alternatives holding violates NEPA and common sense. ........ 8

B. The district court's predetermination holding was factually and legally wrong. ........ 12

C. The district court erred in vacating the EIS and ROD. ........ 17

II. TVA will be irreparably harmed absent a stay. ........ 18

III. The balance of harms and public interest weigh heavily in favor of a stay. ........ 20

CONCLUSION ........ 22

CERTIFICATE OF COMPLIANCE ........ 23

CERTIFICATE OF SERVICE ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .......... 2, 17

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .......... 9

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) .......... 17

*Burkholder v. Peters*,
58 F. App'x 94 (6th Cir. 2003) .......... 13

*Central & S. Motor Freight Tariff Ass'n, Inc. v. United States*,
843 F.2d 886 (6th Cir. 1988) .......... 11

*Diné Citizens Against Ruining Our Env't v. Haaland*,
59 F.4th 1016 (10th Cir. 2023) .......... 16

*Environmental Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*,
470 F.2d 289 (8th Cir. 1972) .......... 12

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
611 F.3d 692 (10th Cir. 2010) .......... 12, 13, 14

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) .......... 21

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) .......... 19

*Kentucky v. EPA*,
No. 23-3216, 2023 WL 11871967 (6th Cir. July 25, 2023) .......... 19, 20

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978) .......... 21

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) ....................................................................13

*Michigan Bell Tel. Co. v. Engler*,
257 F.3d 587 (6th Cir. 2001) ......................................................................19

*Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
945 F.2d 150 (6th Cir. 1991) ..................................................................7, 18

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015)...................................................................15

*National Audubon Soc'y v. Department of the Navy*,
422 F.3d 174 (4th Cir. 2005) ......................................................................14

*National Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025)................................................................................19

*Nken v. Holder*,
556 U.S. 418 (2009).......................................................................................7

*Philip Morris USA Inc. v. Scott*,
561 U.S. 1301 (2010) (Scalia, J., in chambers)...........................................19

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025) .....................................................................11

*Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*,
914 F.3d 213 (4th Cir. 2019) ......................................................................13

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025)...........................................................3, 4, 9, 12, 18

*Sierra Club v. Ga. Power Co.*,
180 F.3d 1309 (11th Cir. 1999) ...................................................................21

*Tennessee Conf. of the NAACP v. Lee*,
105 F.4th 888 (6th Cir. 2024) .......................................................................3

*Tennessee Envtl. Council v. TVA*,
32 F. Supp. 3d 876 (E.D. Tenn. 2014)..........................................................14

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ....................20

*United States v. Turkette*,
452 U.S. 576 (1981) ....................12

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ....................9

*Wyoming v. U.S. Dep't of Agric.*,
661 F.3d 1209 (10th Cir. 2011) ....................13

**STATUTES**

5 U.S.C. § 706(2)(A) ....................4

16 U.S.C. §§ 831 to 831ee ....................3

16 U.S.C. § 831n-4(f), (h) ....................3

42 U.S.C. § 4332(2)(C) ....................3

42 U.S.C. § 4332(2)(C)(iii) ....................4, 9, 11, 12

**OTHER AUTHORITIES**

40 C.F.R. § 1508.1(hh) (2024) ....................10

40 C.F.R. § 1508.1(z) (2020) ....................4

46 Fed. Reg. 18,026 (Mar. 23, 1981) ....................10

88 Fed. Reg. 49,924 (July 31, 2023) ....................4, 10, 11

88 FERC ¶ 61,227 (Sept. 15, 1999) ....................15

Environmental Impact Statement for Kingston Fossil Plant Retirement, 86 Fed. Reg. 31,780 (June 15, 2021) ....................14

Fed. R. App. P. 8(a)(2)(A)(ii) ....................3

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/range (last visited Sept. 22, 2026) ....................11

*Our Power System*, Tenn. Valley Auth., https://www.tva.com/energy/our-power-system (last visited Sept. 22, 2026). ....................................................................3

## LIST OF EXHIBITS

| Tab | Exhibit |
|---|---|
| A | Memorandum Opinion, Aug. 31, 2026 (R. 67) (SEALED; accessible to the Court via the district court's docket) |
| B | Judgment Order, Aug. 31, 2026 (R. 68) (SEALED; accessible to the Court via the district court's docket) |
| C | TVA's Motion to Stay the Court's Judgment Pending Appeal, Sept. 4, 2026 (R. 70) |
| D | TVA's Memorandum in Support of its Motion to Stay Pending Appeal, Sept. 4, 2026 (R. 71) |
| E | Declaration of Clifton Lowry, executed Sept. 3, 2026 (R. 71-1) |
| F | Declaration of Roger T. Waldrep, executed Sept. 3, 2026 (R. 71-2) |
| G | Notice of Appeal, Sept. 21, 2026 (R. 77) |
| H | Precedent Agreement (R. 44-2) (REDACTED; unredacted version available with the district court, *see* R. 45) |

## INTRODUCTION

This emergency motion asks the Court to stay the district court's order vacating the Tennessee Valley Authority's ("TVA") environmental impact statement ("EIS") and record of decision ("ROD") for the replacement of coal-fired generation with gas at its Kingston plant ("Kingston project") while this Court decides whether the district court read the National Environmental Policy Act ("NEPA") correctly. The Kingston project, now 45% complete, is a more than $2.5 billion power plant essential to meet anticipated electricity demand. If TVA must halt construction because of the district court's order, irreparable harm to TVA and dire consequences to the public will accrue immediately and cannot be undone by a favorable judgment months from now.

Because construction continues daily and the harms described below accrue the moment work stops, TVA respectfully requests that the Court enter a temporary administrative stay of the district court's judgment while the Court considers this motion. Alternatively, TVA requests that the Court expedite briefing on this motion so that it may be resolved before those irreversible harms occur.

TVA satisfies each of the stay elements. The district court sustained TVA's purpose-and-need statement and held TVA's EIS took the requisite hard look at the Kingston project's environmental effects but vacated the EIS and ROD regardless for reasons that cannot survive review. First, it held that NEPA requires an agency

to study "more than one" alternative—a numerical floor that appears nowhere in NEPA's text, that Congress did not enact when it codified the preexisting "reasonable range" standard, and that courts do not impose. Second, it found predetermination by misreading Section 9(B)(ii) of TVA's contract for natural gas supply with East Tennessee Natural Gas ("ETNG"). This provision conditioned TVA's obligation to perform on completion of an environmental review for "the Kingston Project," but the district court found that it could be satisfied by choosing *any* generation alternative. This is nonsensical and ignores the contract's definition of "Kingston Project" as the gas plant and the pipeline to supply it. Third, the district court ignored TVA's request to brief remedy and vacated TVA's decision without performing the required analysis under *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). This too was legal error.

The resulting harm is concrete and irreversible. A stop-work order would add more than 25% to a $2.5 billion budget, and TVA cannot recover those costs. It would put over 2,000 craft workers out of work, more than half of whom commute over fifty miles and would find work elsewhere should the Kingston project be halted. It would burn time on manufacturer warranties for, and risk deterioration of, essential and costly equipment like turbines, generators, and transformers that are already on site. And it would jeopardize the roughly 1,500 MW of firm, dispatchable capacity that TVA must place in service to avoid exposing ten million people across

seven states to rolling blackouts. The public interest likewise favors a stay, and Plaintiffs cannot claim an injury from construction that they never sought to enjoin. A favorable judgment on appeal, without a stay, repairs none of that.[*]

## STATEMENT OF THE CASE

### I. Legal Background

TVA is a wholly owned corporate agency and instrumentality of the United States. 16 U.S.C. §§ 831 to 831ee. Among its primary statutory objectives is supplying reliable electric power "at rates as low as are feasible." 16 U.S.C. § 831n-4(f), (h). TVA operates the nation's largest public power system, delivering electricity to ten million people across a seven-state service area. *Our Power System*, Tenn. Valley Auth., https://www.tva.com/energy/our-power-system (last visited Sept. 22, 2026).

NEPA requires federal agencies like TVA to prepare an EIS for a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). NEPA is a "purely procedural statute"; it does not mandate that agencies achieve particular substantive results. *Seven Cnty. Infrastructure Coal.*

[*] TVA moved for a stay in the district court on September 4 (R. 70–71), along with expedited briefing (R. 72), and requested a ruling by no later than September 18 (R. 75 at PageID # 1312). The district court expedited briefing but has not ruled as of September 22. The district court thus "failed to afford the relief requested." *See* Fed. R. App. P. 8(a)(2)(A)(ii); *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 899 (6th Cir. 2024).

*v. Eagle County*, 605 U.S. 168, 184 (2025). Review of NEPA studies proceeds under the Administrative Procedure Act ("APA"), which permits a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts owe agencies "substantial deference" in this domain and "should not micromanage . . . agency choices so long as they fall within a broad zone of reasonableness." *Seven County*, 605 U.S. at 183.

The Fiscal Responsibility Act of 2023 ("FRA") amended NEPA to require an EIS to discuss "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii). The previous version of the statute required an EIS to include "alternatives to the proposed action." *See infra* at 8–10. The Council on Environmental Quality ("CEQ") has explained that the amendments "largely codify longstanding principles" already reflected in its regulations, agency practice, and in prior precedent. NEPA Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49,924, 49,924–25 (proposed July 31, 2023); *see* 40 C.F.R. § 1508.1(z) (2020).

## II. Factual Background

**A.** In 2021, TVA announced its plan to retire the nine coal-fired units at its Kingston Fossil Plant and to construct replacement generation. (R. 67 at PageID # 1201.) TVA commenced the NEPA process on June 15, 2021 and opened a public

scoping period that ran through July 15, 2021. (*Id.*) TVA determined that replacement generation must supply at least 1,500 MW of firm, dispatchable power by the end of 2027 to maintain planning reserve margins, meet peak capacity demand, and support local transmission voltage stability. (*Id.* at PageID ## 1209–10; R. 52-1 at PageID # 950.) One potential replacement, later listed in the Draft EIS as the preferred alternative, was gas-fired generation. (R. 67 at PageID ## 1201–02.)

Securing a firm fuel supply for the gas alternative required substantial lead time. On August 12, 2021 (after the NEPA process had begun), TVA executed a precedent agreement with ETNG. (Ex. H.) Section 9(B)(ii) made TVA's performance obligations contingent on completion of environmental reviews for the "Kingston Project," defined to include the proposed gas plant and the pipeline to supply it. (Ex. H at PageID ## 718, 728.) The agreement's negotiated conditions precedent and termination provisions preserved TVA's ability to select a different alternative. (R. 52-1 at PageID ## 955–56; R. 60-1 at PageID # 1116.)

TVA published its Final EIS in February 2024 and, on April 8, 2024, issued a Record of Decision adopting the preferred alternative. (R. 67 at PageID ## 1202–03.)

**B.** Six months after TVA rendered its final NEPA decision, environmental groups sued. They alleged that TVA failed to take a hard look at environmental effects, failed to study a reasonable range of alternatives, and predetermined the gas

alternative through the precedent agreement. (R. 1 at PageID ## 35, 37, 41.) In the nearly two years this case was pending, Plaintiffs never moved to stop construction. (R. 71 at PageID # 1261.)

On August 31, 2026, the district court ruled on the parties' cross-motions for summary judgment. (R. 67; R. 68.) The court held that TVA's purpose-and-need statement was reasonable and that TVA took the requisite "hard look" at environmental consequences. (R. 67 at PageID ## 1209–10, 1216, 1218.) It nonetheless concluded that TVA studied an inadequate range of alternatives because NEPA requires an agency to "consider multiple alternatives (more than one)" (*id.* at PageID ## 1213, 1215); that TVA "violated NEPA's timing requirements through its ETNG contract because it was precommitted to the decision before even beginning the NEPA process and before writing its Draft EIS" (*id.* at PageID # 1230); and that vacatur was warranted because the identified errors were "fundamental to the analysis" (*id.* at PageID # 1248). The court did not address the disruptive consequences of vacatur (*id.*), and entered that remedy without the separate briefing TVA requested (R. 60-1 at PageID ## 1128–29). The judgment vacated both the EIS and the ROD. (R. 68 at PageID # 1252.)

On September 4, 2026, TVA moved in the district court for a stay pending appeal and simultaneously moved for expedited briefing, requesting a decision by

September 18. (R. 70–72, 75.) The district court expedited briefing but did not rule by September 18.

## STANDARD OF REVIEW

In evaluating a stay motion, this Court applies "the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction": (1) TVA's likelihood of success on appeal; (2) whether TVA will be irreparably harmed absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Michigan Coal. of Radioactive Material Users*, *Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *accord Nken v. Holder*, 556 U.S. 418, 434 (2009).

These factors "are not prerequisites that must be met but are interrelated considerations that must be balanced together." *Griepentrog*, 945 F.2d at 153. The first two are the most critical. *Nken*, 556 U.S. at 434. "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury" the movant will suffer absent a stay, and TVA must show at a minimum "serious questions going to the merits." *Griepentrog*, 945 F.2d at 153–54 (citation modified).

## ARGUMENT

### I. TVA is likely to succeed on the merits.

The district court erred in granting summary judgment to Plaintiffs. It misinterpreted NEPA and TVA's contract. There are serious questions going to the merits of both rulings.

#### A. The district court's reasonable-alternatives holding violates NEPA and common sense.

The district court held that "when an agency makes a decision, it must consider more than one alternative that meets the purpose and need of the proposal." (R. 67 at PageID # 1215.) The court acknowledged "that other courts have found an agency considered a reasonable range of alternatives even after only considering one alternative and a no-action alternative" and that "courts have even stated there is no numerical floor on alternatives to be considered." (*Id.* at PageID # 1212.) Yet the district court became, to TVA's knowledge, the first court to require that an agency must, in all instances, "consider multiple alternatives"—that is, "more than one"—in an EIS. (*Id.* at PageID # 1213.)

That holding is novel. Under NEPA regulations, agencies must consider a no-action alternative and one or more action alternatives. What matters is that the alternatives meet the proposed project's purpose and need. The district court arbitrarily required a numerical floor—at least two alternatives that are both feasible and meet the purpose and need.

The district court's conclusion primarily rests on an erroneous interpretation of the FRA's 2023 amendments to NEPA that failed to read the relevant text in context. (*Id.* at PageID ## 1212–13.) Prior to the FRA, NEPA required an EIS to include "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii) (2018). The amended language requires "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible and meet the purpose and need of the proposal." (R. 67 at PageID ## 1212–13.) Congress did not require agencies to always consider "more than one" alternative.

Instead, the FRA imposed a flexible standard that is context dependent. The "range of alternatives" that is "reasonable" in light of what is "technically and economically feasible" will vary based on the agency action. As the Supreme Court recently instructed, the choice of reasonable alternatives belongs to the agency. "'[T]he term "alternatives" is not self-defining,' and '[c]ommon sense' should be brought to bear." *Seven County*, 605 U.S. at 182 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978)). "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

The focus is therefore on whether the range of alternatives that fit the purpose and need is "reasonable," not on whether it clears a fixed numerical threshold.

Contrary to the district court's interpretation, the purpose of the FRA was to codify the longstanding flexible standard reflected in the prior precedent—including the Supreme Court's—not to depart from it. *Accord* 88 Fed. Reg. 49,924, 49,924–25 (noting that the FRA "largely codif[ies] longstanding principles that EISs should include discussion of . . . a reasonable range of alternatives to the proposed action"). That standard dates from guidance CEQ issued in 1981, which explained that "what constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case," and that agencies need consider only alternatives that are "practical or feasible from the technical and economic standpoint and using common sense." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,026–27 (Mar. 23, 1981).

Post-amendment action by CEQ reinforces this view. Shortly after the FRA amended NEPA, CEQ updated its regulations to comport with the statutory amendments. CEQ retained the language defining reasonable alternatives as a reasonable range of alternatives that are technically and economically feasible and meet the relevant purpose and need. 40 C.F.R. § 1508.1(hh) (2024). Significantly, CEQ noted that the amendments "largely codify longstanding principles that EISs

should include discussion of . . . a reasonable range of alternatives to the proposed action." 88 Fed. Reg. 49,924, 49,924–25.

The statute's plain meaning likewise undermines the district court's holding. The court relied on Merriam-Webster's definition of a "range" as "a series of things in a line." (R. 67 at PageID # 1211.) While dictionary definitions can be helpful, a statute's words must be read in context. *Salazar v. Paramount Glob.*, 133 F.4th 642, 649–50 (6th Cir. 2025). It is clear that the focus of § 4332(2)(C)(iii) is on the "alternatives" an agency identifies for review, not the "range." It is up to the agency to identify alternatives that would meet the purpose and need. Of these, only a "range" need be evaluated. But sometimes, as is the case here, an agency has only one option. The "range" of a set consisting of a single item is one. *See* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/range (last visited Sept. 22, 2026) (defining "range" to mean, inter alia, "the distance or amount included or gone over," definition 6(a), and as "the difference between the least and greatest values of an attribute or of the variable of a frequency distribution," definition 7(b)).

The district court's focus on the plural "alternatives" in NEPA violates the number canon. *See Central & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 843 F.2d 886, 894 (6th Cir. 1988). Indeed, the plural "alternatives" was used even before the 2023 amendments when courts widely accepted that the statute imposed no numerical floors. 42 U.S.C. § 4332(2)(C)(iii) (2018).

The court's construction will also lead to absurd results. *See United States v. Turkette*, 452 U.S. 576, 580 (1981). It will require agencies to invent alternatives out of whole cloth when only one option is feasible, prompting agencies to "pad" their environmental reviews with extraneous alternatives to meet an arbitrary number. That would run counter to amendments meant to streamline NEPA review—and to the Supreme Court's instruction in *Seven County*, which was expressly directed at courts' review of agency action under NEPA. As the Court explained, a "legislative acorn has grown over the years into a judicial oak that has hindered infrastructure development 'under the guise' of just a little more process," and "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." 605 U.S. at 184. The district court's numerical floor is a step in the opposite direction.

The district court's reading of 42 U.S.C. § 4332(2)(C)(iii) requiring at least two alternatives regardless of their reasonableness does not accord with the statute's plain text, the canons of construction, or NEPA's legislative and regulatory history. (R. 67 at PageID ## 1213–15.) TVA is likely to succeed on the reasonable-range issue.

### B. The district court's predetermination holding was factually and legally wrong.

**1.** NEPA does not require agencies to be "subjectively impartial." *Environmental Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289,

295 (8th Cir. 1972). An agency may have a preferred alternative, *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 712 (10th Cir. 2010), and may take steps toward that preferred alternative so long as it does not predetermine the outcome before environmental analysis begins, *see Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

Unlawful predetermination occurs “only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome.” *Forest Guardians*, 611 F.3d at 714. When an agency predetermines the outcome, it has not taken the requisite “hard look,” *id.* at 713, or considered “reasonable alternatives,” *Save Our Sound OBX, Inc. v. N.C. Dep’t of Transp.*, 914 F.3d 213, 225 (4th Cir. 2019).

“A petitioner must meet a high standard to prove predetermination,” *Forest Guardians*, 611 F.3d at 714, one “different in kind from mere ‘subjective impartiality.’” *Wyoming v. U.S. Dep’t of Agric.*, 661 F.3d 1209, 1264 (10th Cir. 2011). This Court has recognized that this “high hurdle” requires showing that the agency’s review “was so arbitrary and capricious as to overcome the ‘presumption of regularity’ accorded” to agency action. *Burkholder v. Peters*, 58 F. App’x 94, 99–101 (6th Cir. 2003).

Many federal actions take years to plan and require taking actions *now* to ensure reasonable alternatives remain available in the future. Courts routinely reject

predetermination claims premised on such pre-EIS coordination: "[T]he Court will not hold 'that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the possibility that a particular environmental outcome would be the result of its NEPA review of environmental effects.'" *Tennessee Envtl. Council v. TVA*, 32 F. Supp. 3d 876, 885–86 (E.D. Tenn. 2014) (quoting *Forest Guardians*, 611 F.3d at 715); *see National Audubon Soc'y v. Department of the Navy*, 422 F.3d 174, 205 (4th Cir. 2005) ("One cannot expect an agency in all cases to neatly proceed from environmental analysis to planning."). An agency thus may enter into contracts taking steps toward certain alternatives so long as they are contingent on the outcome of NEPA review.

**2.** TVA did precisely that. TVA initiated scoping by publishing a notice of intent to prepare an EIS in June 2021. Environmental Impact Statement for Kingston Fossil Plant Retirement, 86 Fed. Reg. 31,780 (June 15, 2021). The notice contemplated retirement of all nine coal units with alternate forms of replacement generation, including the gas alternative, which included building a natural-gas pipeline. *Id.* High demand for gas infrastructure and supply required immediate steps to meet the in-service deadline.

Thus, TVA entered a "precedent agreement" with ETNG, which is a preliminary agreement to enter into future firm gas transportation agreements if

certain conditions are met. A precedent agreement is "important evidence of demand for a project," Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227, at 61,748–49 (Sept. 15, 1999), and is commonly used to show "market need" in support of an application for pipeline approval, *see, e.g.*, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1310 (D.C. Cir. 2015). Because FERC approval was necessary for ETNG's pipeline, this step was crucial to maintaining the viability of the gas alternative.

The precedent agreement was contingent on the outcome of the final Kingston EIS and on TVA obtaining necessary regulatory approvals. (Ex. H at PageID ## 716-20.) Recognizing that the NEPA review required the gas pipeline company to take risk, TVA agreed to accept monetary penalties should the gas alternative not be selected. The parties negotiated conditions precedent that allowed the pipeline to conduct certain initial activities with both parties having off-ramps in the event a condition precedent was not achieved. (*Id.* at PageID ## 716-20, 726-29.)

Specifically, as is relevant here, Section 9(B)(ii) required the "completion by July 31, 2023 of environmental reviews and required agency consultations for the construction of the Kingston Project in order to meet requirements under [NEPA]." (Ex. H at PageID # 728.) The "Kingston Project" is defined as TVA's "proposed project to install gas-fired capability to [TVA's] plant, which includes the proposed 1,450 megawatt combined-cycle gas plant and the natural gas pipeline to supply the

units." (*Id.* at PageID # 718.) To keep the gas alternative available, TVA secured these rights early, left open the option to cancel based on the outcome of the NEPA analysis, and accepted the financial risk of termination costs.

Thus, TVA did not "irreversibly and irretrievably commit[] itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome," *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1030-33 (10th Cir. 2023), but instead took reasonable steps to keep its preferred option viable, accepting significant potential liability that was commercially reasonable in the context of a project cost exceeding $2.5 billion, Ex. F, Waldrep Decl. ¶ 4. By its plain terms, the precedent agreement did not irreversibly and irretrievably commit TVA to building the Kingston Project.

**3.** The district court went astray based on a basic misunderstanding of the precedent agreement. The court correctly noted that "[t]he only way to terminate the contract was if one of the conditions precedent was not met" (R. 67 at PageID # 1225), but it misconstrued Section 9(B)(ii)—TVA's condition precedent about NEPA review and "the Kingston Project"—to mean that proceeding with *any* alternative after NEPA review would satisfy that condition. (*Id.*)

That was error. As explained above, Section 9(B)(ii) required completion of environmental reviews for "the Kingston Project"—defined as the gas plant and the natural gas pipeline to supply it—not for any alternative. (Ex. H at PageID ## 718,

728.) Because the court misinterpreted Section 9(B)(ii), it failed to appreciate that TVA's failure to select *the gas alternative* would allow TVA to withdraw from the agreement.

The district court's analysis otherwise confirmed that, absent this misinterpretation, it would have granted TVA summary judgment on this claim: "Had there been a termination provision that made the contract conditional on TVA's selection of the gas plant after NEPA review, then TVA is correct that TVA's responsibility for the pre-service costs would have been no more than a very expensive option contract." (R. 67 at PageID # 1227.) When Section 9(B)(ii) is properly construed, the predetermination claim fails.

**C. The district court erred in vacating the EIS and ROD.**

Courts analyze two factors in determining whether to vacate agency action: (1) "the seriousness of the . . . deficiencies [in the agency's decision] (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51. Although the district court characterized the deficiencies it identified as "fundamental to the analysis," it did not analyze the second factor, ignoring TVA's request to brief the issue. As outlined below, the disruptive consequences of vacatur are a vitally important part of the Court's equitable analysis here. *Cf. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th

Cir. 2015) (rejecting environmental group's "argument that the potential disruption to the mining industry is irrelevant" to whether vacatur was appropriate).

That omission is significant, because vacatur does not follow automatically from a perceived defect in an EIS. As the Supreme Court explained in *Seven County*, "even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." 605 U.S. at 185. Review of an EIS "is not the same thing as review of the agency's final decision concerning the project," and "[t]he ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 185–86. The district court never asked that question.

## II. TVA will be irreparably harmed absent a stay.

The harm here is measured by "the substantiality of the injury alleged, the likelihood of its occurrence, and the adequacy of the proof provided." *Griepentrog*, 945 F.2d at 154. If TVA must stop work, TVA and its ratepayers will lose money that can never be recovered, a workforce TVA cannot reassemble, warranty coverage on equipment already delivered, and the generating capacity its statutory mandate requires. None of it can be repaired by a favorable judgment on appeal.

The Kingston project carries a budget exceeding $2.5 billion. A stop-work order would add more than 25% to that figure. Ex. F, Waldrep Decl. ¶ 4. Those costs are unrecoverable. *Id.* Monetary loss is irreparable when "the funds cannot be recouped and are thus irrevocably expended." *National Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658–59 (2025) (mem.) (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). This Court has held that unrecoverable compliance costs are irreparable. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *accord Kentucky v. EPA*, No. 23-3216, 2023 WL 11871967, at *4 (6th Cir. July 25, 2023). And even if the costs were forced on downstream customers, like TVA's ratepayers, the loss of goodwill with TVA's ratepayers is a type of irreparable harm. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) ("[E]ven if higher rates and fees do not drive customers away, loss of established goodwill may irreparably harm a company.").

Between 2,000 and 2,100 craft laborers work at Kingston every day. Ex. F, Waldrep Decl. ¶ 5. Roughly 55% commute more than fifty miles and, once furloughed, will not come back. *Id.* ¶¶ 5–6. The resulting loss of labor continuity "could threaten the proper installation of the equipment and ultimately plant performance." *Id.*

Eighty-five percent of the large equipment for the Kingston project has been delivered, and four-year manufacturer warranties on gas turbines, generators,

motors, and transformers are running. *Id.* ¶ 8. A shutdown risks warranty coverage and deterioration of this costly equipment. *Id.* ¶¶ 8–9.

A stoppage puts the regional grid at risk. TVA committed to retire Kingston's coal-fired units and replace them with roughly 1,500 MW of gas-fired capacity. Ex. E, Lowry Decl. ¶ 8. Without that capacity, the TVA territory is at high risk of outages and rolling blackouts during peak demand. *Id.* ¶ 9. Demand has grown faster than predicted, and TVA needs the plant regardless of whether the coal units run past 2027. *Id.* ¶ 11. Each day of stoppage pushes the in-service date back by exponentially more than a day. Ex. F, Waldrep Decl. ¶ 9. Grid instability is irreparable injury standing alone. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) ("plant closures" and "the threat of grid instability and potential brownouts alone constitute irreparable injury"); *see Kentucky v. EPA*, 2023 WL 11871967, at *4.

**III. The balance of harms and public interest weigh heavily in favor of a stay.**

Plaintiffs can hardly claim harm from continued construction—something they never asked any court to halt. They filed suit on October 10, 2024, litigated for nearly two years, and moved for summary judgment, all without seeking a preliminary injunction or a temporary restraining order against construction work. (R. 71 at PageID # 1261.)

The public-interest inquiry balances the impact of the grant or denial of the stay on the public at large with a specific focus on the "correct application of the

law" at issue, *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022), which runs in TVA's favor. Without a stay, the entire service territory is "at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand." Ex. E, Lowry Decl. ¶ 9. Courts have consistently protected that interest. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety."); *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical.").

## CONCLUSION

The Court should stay the district court's vacatur of the EIS and ROD pending appeal. The Court should additionally enter a temporary administrative stay pending this Court's disposition of the stay motion. Alternatively, TVA requests that the Court expedite briefing on this motion so that it may be resolved before any irreversible harm occurs.

September 22, 2026

Respectfully submitted,

*/s/ Maria V. Gillen*

Maria V. Gillen
F. Regina Koho
Lane E. McCarty
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Dr.
Knoxville, Tennessee 37902-1401
(865) 632-7741
mvgillen@tva.gov

Nash E. Long
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
nash.long@bakerbotts.com

Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1234
beau.carter@bakerbotts.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this motion complies with the length limit of Fed. R. App. P. 27(d)(2)(A) because it contains 4,933 words, excluding the accompanying documents authorized by Fed. R. App. P. 27(a)(2)(B) and the items excluded by Fed. R. App. P. 32(f), as counted by the word-processing system used to prepare it. This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font, and with the format requirements of Fed. R. App. P. 27(d)(1). This certificate is submitted pursuant to Fed. R. App. P. 32(g).

Dated: September 22, 2026

*/s/ Maria V. Gillen*
Maria V. Gillen

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Maria V. Gillen*
Maria V. Gillen

# Tab A

## Memorandum Opinion, Aug. 31, 2026 (R.67)(SEALED; accessible to the Court via the district court's docket)

# Tab B

## Judgment Order, Aug. 31, 2026 (R.68)(SEALED; accessible to the Court via the district court's docket)

# Tab C

# TVA's Motion to Stay the Court's Judgment Pending Appeal, Sept. 4, 2026 (R.70)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v. No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

**TVA'S MOTION TO STAY THE COURT'S JUDGMENT PENDING APPEAL**

Pursuant to Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a), Defendant Tennessee Valley Authority ("TVA") moves for a stay of the Court's Judgment Order entered on August 31, 2026, vacating TVA's Environmental Impact Statement and Record of Decision studying the environmental impacts of replacing coal-fired units at the Kingston Fossil Plant with gas-fired generation. (Docs. 67 & 68 *SEALED*.) Having a firm belief that the Court committed legal error in its decision, which will have impacts on the project at issue here and other complex infrastructure projects where NEPA reviews are involved, TVA intends to file an expedited appeal of the decision with the United States Court of Appeals for the Sixth Circuit. Due to the harm that will result from any further delay in the Kingston gas plant's construction, and out of an abundance of caution to ensure TVA's full compliance with the Court's order, TVA respectfully moves for a stay of the Court's judgment pending appeal.

Respectfully submitted,

*s/Maria V. Gillen*
Maria V. Gillen (TN BPR 030655)
Associate General Counsel
F. Regina Koho (TN BPR 029261)
Lane E. McCarty (TN BPR 028340)
Steven C. Chin (TN BPR 030011)
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

Amanda Rosemary Garcia, Esq.
O.W. Bussey, III, Esq.
Delaney King, Esq.
Jacqueline Hughwood, Esq.
1033 Demonbreun St., Suite 205
Nashville, Tennessee 37203
615.921.9470
agarcia@selc.org
tbussey@selc.org
dking@selc.org

Gregory D. Buppert, Esq.
Elizabeth M. Putfark, Esq.
201 West Main Street, Suite 14
Charlottesville, Virginia 22902
434.977.4090
gbuppert@selc.org
eputfark@selc.org

*Attorneys for Plaintiffs*

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority

# Tab D

# TVA's Memorandum in Support of its Motion to Stay Pending Appeal, Sept. 4, 2026 (R.71)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v. No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STAY PENDING APPEAL**

---

Maria V. Gillen
Associate General Counsel
F. Regina Koho
Lane E. McCarty
Steven C. Chin
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

**INTRODUCTION**

Defendant Tennessee Valley Authority ("TVA") respectfully moves for a stay of the Court's order of vacatur (Doc. 68 *SEALED*) pending appeal. It is unclear from the face of the order whether the result of the Court's decision is a stop-work order for the construction of the Kingston gas plant that is the subject of the vacated Environmental Impact Statement ("EIS") and Record of Decision ("ROD"). If it is, this will have disastrous consequences, causing the furlough of thousands of workers; unrecoverable expenses for TVA of over half a billion dollars; impairment of warranties and risk of damage to equipment already purchased and delivered to the site; and additional harms to TVA that are impossible to quantify. TVA intends to pursue an expedited appeal of this Court's decision, so resolution of these significant legal issues will be dealt with soon. But TVA faces irreparable harm if it must halt construction in the interim. So, too, does the public. By contrast, Plaintiffs face none: their alleged harms do not stem from the construction of the new plant. Accordingly, the Court should grant a stay pending TVA's expedited appeal. TVA respectfully requests a ruling on this stay request by September 15, 2026, and has simultaneously moved for expedited briefing on this motion in order to meet that timeline.

**PROCEDURAL BACKGROUND**

In 2021, TVA announced its plan to retire the nine coal-fired units at its Kingston Fossil Plant and construct replacement generation. As permitted by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., TVA identified a preferred alternative—retiring Kingston's coal units and replacing them with gas-fired generation. Because of the complexities involved in securing a fuel source for the preferred alternative, TVA entered into a precedent agreement ("PA") with East Tennessee Natural Gas ("ETNG") that would begin this process. The PA was not entered into until after TVA's NEPA process had begun through the publication of a

Notice of Intent to prepare an EIS. AR Doc. 1 at 1. In accordance with NEPA, TVA completed its comprehensive review of the potential environmental impacts of the proposed action and published its final EIS in February 2024. In April 2024, TVA's then President and CEO Jeff Lyash signed the ROD that made the final decision to adopt the preferred alternative.

Six months later, on October 10, 2024, Appalachian Voices, Center for Biological Diversity, and Sierra Club ("Plaintiffs") brought this action, alleging (as is pertinent here) that TVA violated NEPA by failing to adequately evaluate significant environmental impacts associated with its decision to retire the coal-fired units at Kingston and replace them with gas-fired generation; by failing to evaluate reasonable alternatives within the EIS; and by predetermining the gas plant option based on TVA's entry into a PA with ETNG. In the almost two years this litigation has been pending, Plaintiffs never moved to enjoin construction of the gas plant.

Both parties filed competing motions for summary judgment, on which this Court recently ruled and entered judgment. (Docs. 67 & 68 *SEALED*.) Although finding that TVA took the "hard look" at the environmental consequences of its proposed action and alternatives (*see* Mem., Doc. 67 *SEALED* at PageID## 1215–18)—which is "the 'heart' of the NEPA analysis," *W. Watersheds Project v. Vilsack*, No. 23-8081, 2024 WL 4589758, at *15 (10th Cir. Oct. 28, 2024)—this Court nonetheless set aside and vacated TVA's EIS and the ROD. Specifically, the Court ruled: (1) that TVA did not consider a reasonable range of alternatives because two of the three alternatives the EIS studied in detail "did not meet the purpose and need of the project" (Mem., Doc. 67 *SEALED* at PageID# 1214); (2) that "TVA violated NEPA's timing requirements through its ETNG contract because it was precommitted to the decision before even beginning the NEPA Process and before writing its Draft EIS" (*id.* at PageID# 1230); and (3) that vacating the

EIS and the ROD was the appropriate remedy because these errors were not "technical," but were instead "fundamental to the analysis." (*Id.* at PageID# 1248.)

As set forth more fully below, stopping work would irreparably harm TVA and the public. It would impede TVA's ability to meet the growing electricity demand for its service territory and risk disruption in the supply of electricity upon which the public depends. It would lead to the furlough of approximately 2,000 workers and stop their paychecks. It would impose additional costs on TVA that could amount to almost half as much as the gas plant project itself. It will also impose additional costs that are difficult to quantify, such as impairment of equipment warranties and risk of damage to delivered equipment. If the Court's order is not stayed and TVA must stop work, the harms to the public and to TVA would be irreparable.

**ARGUMENT**

When determining whether a stay should be issued pending appeal, "a trial court should apply 'the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction.'" *United States v. Xiaorong You*, No. 2:19-CR-14, 2020 WL 1932360, at *1 (E.D. Tenn. Apr. 21, 2020) (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). "These well-known factors are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Griepentrog*, 945 F.2d at 153. "These factors are not prerequisites that must be met but are interrelated considerations that must be balanced together." *Id.* However, the first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). For the reasons outlined below, the Court should grant TVA's motion for a stay pending appeal.

## I. A stay pending appeal is proper because TVA is likely to succeed on the merits as to the three claims on which Plaintiffs were granted summary judgment.

Although the party seeking a stay "need not always establish a high probability of success on the merits, the party is still required to show, at a minimum, serious questions going to the merits." *Griepentrog*, 945 F.2d at 153–54 (citation modified). For the reasons outlined below, TVA can show serious questions going to the merits of the Court's ruling on reasonable alternatives; predetermination; and vacatur. Thus, this factor, one of "the most critical," *Nken*, 556 U.S. at 434, weighs in favor of granting the requested stay.

### A. Reasonable alternatives

The Court initially found that the EIS's "purpose-and-need statement is in line with TVA's statutory mandate [and] broad enough in that it essentially requires nothing more than a reliable source of generation that is able to meet the needs of the region while allowing the retirement of the fossil plant." (Mem., Doc. 67 *SEALED* at PageID# 1210.) This finding was correct and should have further informed the Court's analysis of whether TVA's study of two alternatives was reasonable. But the Court instead focused on NEPA's use of the term "range." Although acknowledging that many courts have found that a reasonable range of alternatives can consist of a no-action and one action alternative, the Court concluded that the Fiscal Responsibility Act ("FRA"), which amended NEPA in 2023 towards the end of TVA's NEPA process, changed the playing field and required an agency to "consider multiple alternatives (more than one)" in an EIS. (*Id.* at PageID# 1213.) This conclusion is mistaken.

Prior to the FRA, NEPA required an EIS to include "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii) (2022). The amended language requires an EIS to include "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). With this

amendment, Congress directed agencies to analyze "a reasonable range of alternatives" that are both "feasible" and "meet the purpose and need of the proposal." The crux of this provision is the "alternatives"—not "reasonable range." Appropriate alternatives are derived from the purpose and need for the proposal, and, in some cases, there may be no feasible alternative at all; accordingly, there may be no alternatives from which to select a range. If multiple feasible alternatives exist, the "reasonable range" limits what the agency must evaluate—it need not evaluate every conceivable "alternative" but may limit its review to feasible alternatives as a reasonable range. As the Supreme Court recently instructed, a court's focus should be on whether the range of alternatives studied is "reasonable," not whether they meet a numerical threshold. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Co.*, 605 U.S. 168, 182–83 (2025) ("When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices . . . Courts should afford substantial deference and should not micromanage those agency's choices so long as they fall into a broad zone of reasonableness."). Contrary to the Court's interpretation, the purpose of the FRA amendment was to codify—and preserve—agency flexibility in determining which alternatives are appropriate to evaluate. The Court's focus on "range" removes this flexibility.

Several canons of construction also support TVA's interpretation and weigh against the Court's. The Court's focus on the plural use of "alternatives" runs afoul of the number canon, which posits that the use of the singular includes the plural and vice versa. *See, e.g.*, *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 843 F.2d 886, 894 (6th Cir. 1988) ("That argument violates a basic principle of statutory interpretation—that the singular includes the plural and the plural includes the singular. 1 U.S.C. § 1."). This canon is codified by the Dictionary Act,

1 U.S.C. § 1. So, an agency's conclusion that there is only one action alternative that is feasible is consistent with the plain meaning of the statute.

The Court's construction will also lead to absurd results, which courts should avoid. *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 580 (1981) (instructing that statutes should be construed to avoid absurd results). For one, it will require agencies to create alternatives out of whole cloth when the reality of the situation is that only one is feasible. The Court's holding might prompt agencies to "pad" their environmental reviews with extraneous alternatives to meet an arbitrary number. This would run counter to the motivation for the recent amendments meant to streamline NEPA reviews. *See, e.g.*, NEPA Law & Litig. § 2:1.50 (2025) (recognizing that FRA amendments qualified and narrowed NEPA's core mandate regarding the preparation of environmental impact statements).

In addition, Congress is presumed to act with awareness of prior interpretations of the law. *See Fluor Corp. & Affiliates v. United States*, 126 F.3d 1397, 1404 (Fed. Cir. 1997). Thus, it is presumed that the FRA merely codified long-standing interpretation of the statute and existing regulatory language, not effected a wholesale change to existing principles without so stating. And when the Council on Environmental Quality ("CEQ") added language defining reasonable alternatives as a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need to its regulations in 2020, its stated intent was to codify CEQ guidance dating back to 1981 on the appropriate range of alternatives. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43351 (July 16, 2020). Congress took this language from CEQ's regulation and enshrined it in NEPA via the FRA amendment.

Subsequent action by CEQ reinforces this view. Shortly after the FRA's enactment in 2023, CEQ updated its regulations to comport with the statutory amendments. CEQ retained the language defining reasonable alternatives as a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need. 40 C.F.R. § 1508.1(z)(hh) (2024). Significantly, CEQ noted that the amendments "largely codify longstanding principles that EISs should include discussion of . . . a reasonable range of alternatives to the proposed action." National Environmental Policy Act Implementing Regulations Revisions Phase 2, Proposed Rule, 88 Fed. Reg. 49924, 49924–25 (July 31, 2023).

In sum, the Court's reading of NEPA's alternatives requirement is not in accord with the statute's plain text, canons of construction, or NEPA's legislative and regulatory history. In addition, the Court's alternatives conclusion does not square with the Court's findings that TVA framed a proper purpose and need for the proposed project and took the requisite "hard look" at the environmental impacts of the project by conducting a thorough analysis of options.

**B. Predetermination**

TVA can show serious questions going to the merits of the Court's predetermination ruling for several reasons. First, the Court ignored a key term—the "Kingston Project"—in its analysis, which caused it to make a faulty conclusion. Section 9(B)(ii) of the PA provides one of the conditions precedent for TVA's performance obligations under the agreement. Specifically, it requires the "completion by July 31, 2023 of environmental reviews and required agency consultations for the construction of *the Kingston Project* in order to meet requirements under" various environmental laws. AR Doc. 524 at 55179–80 (emphasis added). The PA defines "Kingston Project" as "Shipper's [TVA's] proposed project to install gas-fired capability to Shipper's Plant, which includes the proposed 1,450 megawatt combined-cycle gas plant and the

natural gas pipeline to supply the units[.]" AR Doc. 524 at 55169. Section 9(B)(ii) read together with the definition of "Kingston Project" required as a condition precedent that TVA complete an environmental review for the construction of the Kingston gas plant and the gas pipeline and not any other alternative. Giving each material term its full meaning and reading all terms together, TVA would not have met this condition precedent and would have been under no obligation to perform on the contract without the completion of such an environmental review.

An interpretation of a contract that "gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a). The Court misinterpreted section 9(B)(ii) as "merely require[ing] the issuance of a ROD—any ROD—in a timely manner and did not specify that the condition precedent to fulfilling the contract would be TVA issuing a ROD *choosing gas*." (Mem., Doc. 67 *SEALED* at PageID# 1226.) The Court then found that "no other condition precedent could be read as providing a means to terminate the contract should TVA choose a non-gas alternative." (*Id.*) Not only does the Court's interpretation of the condition precedent read out the material term "Kingston Project," its interpretation leads to an absurd result. It would require TVA to pay for, and ENTG to complete, a gas pipeline if TVA completed an environmental review for and chose a non-gas alternative for the replacement generation at Kingston.

Second, the Court found that "TVA violated NEPA's timing requirements through its" PA with ETNG "because it was precommitted to the decision before even beginning the NEPA Process and before writing its Draft EIS." (*Id.* at PageID# 1230.) The Court's recitation of the factual background discusses when the NEPA process started in relation to the signing of the PA (*id.* at PageID## 1201–04), but it is not specifically mentioned in the Court's analysis of this claim. And the finding that TVA "precommitted to the [gas plant] decision before even beginning the

NEPA process" (*id.* at PageID# 1230) is incorrect. TVA began the NEPA process on June 15, 2021, when it issued its Notice of Intent to prepare an EIS, which included the gas plant option and kicked off the Scoping Process involving the public. The PA was executed on August 12, 2021. The opinion does not explain why this timing was in violation of NEPA.

Third, this Court granted TVA's motion for summary judgment on Plaintiffs' claim three and ruled that the EIS took the requisite "hard look" at the environmental effects of its proposed action. (*See id.* at PageID## 1215–16.) Yet, in deciding Plaintiffs' predetermination claim, the Court found that TVA's precedent agreement with ETNG "prevented TVA from taking the requisite 'hard look' at the environmental consequences of its actions." (*Id.* at PageID# 1228.) The Court's holding cannot be reconciled with the holding that TVA *did* take the hard look required by NEPA.

Last, the Court's holding fails to take into account the complexities of a major infrastructure project, like the construction of a gas plant, where a component of that project is contingent on the work of a third party that cannot take on 100% of the project's risk (and is subject to a separate NEPA and permitting process). Essentially, Plaintiffs' position, which was accepted by the Court, is that federal agencies cannot commit resources towards a preferred alternative until they have reached some undefined point in the NEPA process. This is not a workable rule for large-scale infrastructure projects that are subject to NEPA.

**C. Vacatur**

As this Court correctly noted (*see* Mem., Doc. 67 *SEALED* at PageID# 1248), courts typically analyze two factors in determining whether to vacate an agency's decision: (1) "the seriousness of the . . . deficiencies [in the agency's decision] (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may

itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Although it characterized the errors identified in the EIS to be "fundamental to the analysis" (Mem., Doc. 67 *SEALED* at PageID# 1248), this Court did not analyze the second *Allied-Signal* factor—the disruptive consequences of vacatur.[1] Given the circumstances presented here, outlined more fully in section II., *infra.*, the disruptive consequences of vacatur as a remedy are a vitally important part of the Court's equitable analysis, which heightens the necessity to evaluate the facts involved. *Cf. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (rejecting environmental group's "argument that the potential disruption to the mining industry is irrelevant" to the analysis in determining whether vacatur was appropriate). A court cannot issue injunctive relief without examining the essential factors and absent briefing. And TVA specifically requested that separate briefing be allowed on the question of remedy. (*See* Doc. 61 at PageID## 14–15 ("TVA respectfully requests that, should the Court find that Plaintiffs prevail on any of their claims, it set a separate briefing schedule on the question of the appropriate remedy.").) As noted previously, Plaintiffs have *never* moved for injunctive relief during this case. And TVA did not have the opportunity to provide the Court with information related to the harm that will result from any delay to the Kingston gas plant's construction. Thus, there is a serious question as to whether the Court correctly granted vacatur as a remedy without having the necessary information to engage in the full inquiry. *Cf. Seven Cnty.*, 605 U.S. at 183 (criticizing NEPA's "transform[ation] from a modest procedural requirement into a blunt and haphazard tool employed by project opponents . . . to try to stop or at least slow down new infrastructure and construction projects").

[1] And neither did Plaintiffs. They made only the conclusory statement that "[a]ny disruptive consequences are outweighed by seriousness [sic] of TVA's errors, which are 'fundamental'" when they argued this matter for the first time on reply. (Doc. 56-1 at PageID# 1066.)

## II. A stay pending appeal is proper because TVA will be irreparably injured absent one.

In evaluating the harm that will occur if a stay is not granted, a court generally looks to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided. *Griepentrog*, 945 F.2d at 154. The harm alleged must also be both certain and immediate, rather than speculative or theoretical. *Id*.

Halting or suspending construction would significantly and adversely impact TVA's ability to reliably meet load demand within the TVA territory. (*See* Declaration of Clifton Lowry ("Lowry Decl.") at ¶¶ 9-10.)[2] The generating capacity expected to be provided by the Kingston gas plant is needed to meet projected demand for electricity and without it, the entire TVA territory will be at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand. (*See id.* at ¶ 9.) If TVA is unable to provide adequate and reliable power, it is without question that TVA's customers will suffer irreparable harm. This also means that TVA would not be able to fulfill its statutory obligation to maintain reliability. *See, e.g.*, *Kentucky v. EPA*, No. 23-3216, 2023 WL 11871967, at *4 (6th Cir. Jul. 25, 2023) (concluding that the movant would face irreparable harm when the movant "provide[d] evidence that Kentucky residents will face higher prices and that Kentucky's power grid [would] face destabilization"); *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (movant raised the threat of permanent closure of plants that could arise if a stay were not granted and concluding that "plant closure [and] the threat of grid instability and potential brownouts alone constitute irreparable injury").

The harm from an immediate stop-work order that lasts for an indefinite time extends beyond TVA and is also likely to have a significant adverse effect on the more than 2,000 hourly

[2] The Lowry Declaration is attached to this memorandum as Exhibit 1.

workers currently working at the Kingston Reservation. (*See* Declaration of Roger Waldrep ("Waldrep Decl.") at ¶ 5.)[3] If work on the Kingston project is halted for an indefinite amount of time, TVA would be forced to furlough or release the more than 2,000 skilled craft laborers currently working on the project. (*See id.*) This would leave these hourly employees without pay and, if they are released, without a job. (*See id.*) The income stream for these workers will therefore be adversely impacted by a work stoppage of any duration. (*See id.*) *Accord, e.g.*, *California Communities Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (finding that vacatur of rule, which would halt construction of a power plant, would "be economically disastrous" because the project was "a billion-dollar venture employing 350 workers").

TVA will also be adversely impacted from losing these workers both in terms of loss of labor continuity as well as cost. (*See* Waldrep Decl. at ¶¶ 6–7.) Hiring back such a large number of qualified laborers will come at a significant cost to TVA and will impact TVA's ability to complete the project on schedule even if remobilization occurs. (*See id.* at ¶ 6.) The irreparability of this harm is heightened because the substantial costs TVA will have to spend to ensure contract performance guarantees and to rehire the qualified craft laborers who demobilized following a work stoppage will be unrecoverable. (*See id.* at ¶¶ 4, 7.) *Accord* Emergency Mot. for Stay Pending Appeal at 21–23, *Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-30257 (5th Cir. March 2, 2018) (arguing that allowing injunction to stay in place during appeal would cause "up to $500,000 in standby labor costs alone"); *Basinkeeper v. U.S. Army Corps of Eng'rs*, 715 F. App'x 399 (5th Cir 2018) (granting Emergency Motion for Stay Pending Appeal). The Supreme Court has recently explained when granting a partial stay in *National Institutes of Health v. American Public Health Association* that although "the loss of money is not typically considered an irreparable harm, that

[3] The Waldrep Declaration is attached to this memorandum as Exhibit 2.

changes if the funds cannot be recouped and are thus irrevocably expended." 145 S. Ct. 2658, 2658 (2025) (quoting *Phillip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010)); *see also Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (noting that costs to comply with an order that are "unrecoverable" are irreparable, and that "the peculiarity and size of [unrecoverable compliance costs] affects its weight in the equitable balance, not whether it should enter the calculus at all"). As in *National Institutes of Health*, the costs TVA will be forced to expend in the event of a work stoppage cannot be recouped (*see* Waldrep Decl. at ¶ 4), and therefore constitute irreparable harm to TVA. *See National Institutes of Health*, 145 S.Ct. at 2658.

Plant equipment is also likely to be devalued and adversely impacted as a result of a work stoppage. The majority of the large equipment for the Kingston gas plant has already been delivered to the site and most manufacturers' warranties start to run upon delivery. (*See* Waldrep Decl. at ¶ 8.) A work stoppage of indefinite duration will impair the value of these warranties for any extended period of disuse a shutdown would cause. (*See id.*) The equipment itself may also deteriorate during a prolonged work stoppage, and that may result in an increased likelihood of early failure once it is installed. (*See id.*) Accordingly, a work stoppage is likely to have a significant monetary and operational impact on the gas plant even after the stoppage has been lifted. (*See id.* at ¶ 9.)

Finally, further delay in TVA's timeline to complete construction of the gas plant would impair TVA's ability to respond to and help address the energy emergency identified by the current administration. Executive Order 14156 declared a national energy emergency, proclaiming that "[t]he integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security." 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025). And Executive Order 14154, "Unleashing

American Energy," made it national policy "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation[.]" 90 Fed. Reg. 8353, 8353 (Jan. 20, 2025); *see also* Continuation of the National Emergency With Respect to Energy, 91 Fed. Reg. 1667 (Jan. 12, 2026) (continuing for one year the national emergency declared in Executive Order 14156). As a federal agency that generates electricity, TVA is especially key to fulfilling this mandate. If TVA cannot complete the gas plant, it is unable to support these policies. *Accord, e.g.*, *Save RGV v. Space Expl. Techs. Corp.*, No. 24-cv-00148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024) (injunction could "impact national security by halting" or "delaying" programs "relied on by multiple government agencies").

Because this second "most critical" factor related to the stay analysis, *Nken*, 556 U.S. at 434, supports TVA's request, it weighs heavily in favor of granting a stay here.

### III. The issuance of a stay pending appeal will not substantially injure other interested parties.

Courts use the same test for irreparable harm to determine whether the issuance of a stay will injure other parties—substantiality, likelihood of occurrence, and adequacy of proof. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008).

Plaintiffs have not alleged that the building of the gas plant will be the cause of their injury. The injuries they cited in their complaint and the basis of their standing allegedly arise from the emissions that will be generated by the eventual operation of the gas plant. (*See, e.g.*, Compl., Doc. 1 at PageID# 10 ¶ 41 ("Air pollution from TVA's Kingston Gas Plant is likely to harm Ms. Steele's health and trigger her asthma, impairing her enjoyment of her recreational activities in the area.").) The Kingston gas plant has experienced construction delays and is unlikely to be commercially

operational until 2028. (*See* Waldrep Decl. at ¶ 4.) Thus, the harm identified by Plaintiffs and credited by the Court does not exist now and will not for at least another year. *See United States v. Lanier*, No. 2:14-CR-83, 2018 WL 3795961, at *6 (E.D. Tenn. Aug. 9, 2018) (finding no substantial harm would result from the grant of a motion to stay where the party opposing the stay had not submitted a "particular reason why they would suffer harm" from the stay). Moreover, the gas plant is subject to a Clean Air Act permit requiring that its emissions stay below certain statutory thresholds in order to protect human health and the environment. Given that this Court has already rendered a final ruling and TVA plans to pursue an expedited appeal in this matter, any minimally articulated injuries Plaintiffs could allegedly experience related to the running of the gas plant are unlikely to occur during this time period.

**IV. The public interest weighs in favor of granting the stay.**

The analysis of whether the public interest weighs in favor of granting a stay balances the impact of the grant or denial of the stay on the public at large with a specific focus on the correct application of the law at issue. *Commonwealth v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022).

Initially, delay resulting from TVA's inability to proceed with construction harms the residents of the Tennessee Valley because it risks making TVA unable to reliably meet load demand. (*See* Lowry Decl. at ¶¶ 9-10.) If TVA is forced to reduce load, this will place the entire TVA territory at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand. (*See id.*) Courts have routinely found that access to reliable electricity is in the public interest. *See, e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety."); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (recognizing "the public's interest in ready access to affordable electricity"); *Sierra Club v. Ga.*

*Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical."); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (holding that public interest favored an injunction pending appeal when necessary to preserve power supply to the public).

Second, the thousands of craft laborers employed on the job at present would be furloughed or released from work completely if work had to cease. (*See* Waldrep Decl. at ¶ 5.) As hourly wage-earning employees, this would cause them and their dependents severe economic harm and uncertainty. (*See id.*)

Last, TVA has raised serious concerns with the interpretation and application of the law in this instance, and the public interest would be best served by a stay pending the outcome of an appeal to determine whether the law has been correctly applied. Thus, the public interest weighs in favor of staying the Court's decision pending appeal in this matter.

## CONCLUSION

Because of the irreparable harm that will result should the Court's order require TVA to stop construction of the Kingston gas plant, TVA respectfully requests that this Court stay its decision pending TVA's appeal.

Respectfully submitted,

*s/Maria V. Gillen*

Maria V. Gillen (TN BPR 030655)
Associate General Counsel
F. Regina Koho (TN BPR 029261)
Lane E. McCarty (TN BPR 028340)
Steven C. Chin (TN BPR 030011)
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

Amanda Rosemary Garcia, Esq.
O.W. Bussey, III, Esq.
Delaney King, Esq.
1033 Demonbreun St., Suite 205
Nashville, Tennessee 37203
615.921.9470
agarcia@selc.org
tbussey@selc.org
dking@selc.org

Gregory D. Buppert, Esq.
Elizabeth M. Putfark, Esq.
201 West Main Street, Suite 14
Charlottesville, Virginia 22902
434.977.4090
gbuppert@selc.org
eputfark@selc.org

*Attorneys for Plaintiffs*

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority

# Tab E

# Declaration of Clifton Lowry, executed Sept. 3, 2026 (R.71-1)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v. No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

**DECLARATION OF CLIFTON LOWRY**

I, Clifton Lowry, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1. I am employed by the Tennessee Valley Authority ("TVA") as Vice President, Planning and Investor Relations in TVA's Finance organization, a role which I have held since January 2025. I have worked at TVA for approximately 18 years. During that time, I have held various positions, including Director, Resource Planning and Strategy; Senior Manager, Resource Strategy; Senior Manager, Enterprise Forecasting; Senior Manager, Financial Planning. I make this Declaration based upon my personal knowledge and information made available to me as part of my official duties.

2. Planning and Investor Relations, like its predecessor organizations, establishes and oversees TVA's strategic financial and resource planning that guides TVA's business decisions and develops and analyzes the data used to inform multiple TVA decision making processes. As Vice President, Planning and Investor Relations, I have overall responsibility for TVA's financial and resource planning processes, the results of which are used to guide agency decision makers in the establishment of TVA's revenue requirements and annual budgets as well as the selection of

new energy resources in accordance with strategic priorities, risk considerations, and least cost principles.

3. TVA also has least cost planning responsibilities under the Energy Policy Act. *See* Pub. L. No. 102-486, § 113, 106 Stat. 2776, 2798 (1992). Since 1992, Congress has required TVA to conduct a least-cost planning program, which is a "planning and selection process for new energy resources . . . in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost," 16 U.S.C. § 831m-1(b)(1). This process must consider various factors, such as "necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk; . . . the ability to verify energy savings through energy conservation and efficiency and the projected durability of such savings measured over time; and [must] treat demand and supply resources on a consistent and integrated basis." 16 U.S.C. § 831m-1(b)(2). Planning and Investor Relations is responsible for conducting TVA's least-cost planning program and in my role as Vice President of this organization, I oversee this process.

4. I execute my responsibilities with the assistance of various individuals within Planning and Investor Relations, each of whom report directly to me. I also delegate various functions and tasks to these individuals and their respective staff.

5. I am a direct report to Thomas C. Rice, Executive Vice President and Chief Financial Officer, who reports to Mike Skaggs, President and Chief Executive Officer.

6. I am aware of the above-captioned lawsuit challenging TVA's activities at its Kingston Reservation.

7. The purpose of this Declaration is to explain the impact of a stop work order with regard to construction of the gas plant at the Kingston Reservation and the effect such an order would have on TVA's ability to reliably meet load demand in the TVA territory.

8. In 2024, TVA made a final agency decision to retire the nine coal-fired units at Kingston by the end of 2027 and construct replacement generation consisting of a single natural gas-fired combined cycle (CC) plant and 16 dual-fuel aeroderivative combustion turbines ("Kingston gas plant") to provide approximately 1,500 megawatts to replace the generation of the retiring coal units and ensure reliable, uninterrupted power to TVA customers.

9. TVA has been constructing the Kingston gas plant since April 2024, with work currently ongoing. Halting or suspending construction would significantly and adversely impact TVA's ability to reliably meet load demand within the TVA territory. The generating capacity to be provided by the Kingston gas plant is needed to meet projected demand for electricity. Without the generating capacity of the Kingston gas plant, the entire TVA territory is at a high risk of power outages and rolling blackouts, particularly during periods of peak load demand.

10. The continued construction of the gas plant at Kingston reduces capacity gaps and lowers the need to rely on market purchases. In the event TVA has to turn to the market for real time power purchases, those may not be available to secure sufficient generation to maintain TVA's reserves and meet demand. In this scenario, TVA will be forced into an emergency event which could lead to rolling blackouts to protect the bulk electric system.

11. In February 2026, TVA began a process to evaluate the continued operation of the coal plant in addition to the new gas plant to carry out a Board of Directors' Resolution. That process includes applying for any applicable permits should TVA continue to operate the Kingston coal plant beyond its currently scheduled retirement date. Given the unexpectedly large increase

in demand for electricity, TVA will need the gas plant—and need it soon—in order to serve load regardless of whether the coal plant continues to operate past 2027.

Executed on this the 3rd day of September 2026, in Knox County, Tennessee.

Clifton Lowry

133945029

# Tab F

# Declaration of Roger Waldrep, executed Sept. 3, 2026 (R.71-2)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v. No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

**DECLARATION OF ROGER WALDREP**

I, Roger T. Waldrep, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1. I am employed by the Tennessee Valley Authority ("TVA") as Vice President, Major Projects in the General Projects & Fleet Services organization, a role which I have held since 2020. I have worked at TVA for approximately 33 years, 20 years of which have been in new plant construction. During that time, I have held various positions, including Engineer, Project Manager, and General Manager. I make this Declaration based upon my personal knowledge and information made available to me as part of my official duties.

2. In my role, I am responsible for the planning, cost estimating, engineering, and construction of large, complex projects for TVA's non-nuclear generation groups. This includes, but is not limited to, new gas-fired plants such as simple cycle and combined cycle (CC) plants.

3. In the course of my professional responsibilities and experience, I also have personal knowledge of how TVA's labor contracts are set up and how these laborers are employed and utilized in new plant construction at TVA.

4. I oversee the project at the Kingston reservation where TVA is building a natural gas plant, consisting of a 1x1 Combined Cycle unit and 16 Combustion Turbines. Project activities began onsite in April 2024. The project was initially set for completion by December 2027. However, because of unforeseen delays involving the supply chain, it is now scheduled to be completed by December 2028. Currently, the overall project is approximately half completed, including engineering and procurement work. The overall budget for the Kingston project is over $2.5 billion. A work stoppage order could add over $25% to this overall budget, depending on the length of the work stoppage. These additional costs would be unrecoverable.

5. The Kingston project currently has 2,000 to 2,100 craft laborers onsite. These workers are all hired by TVA's labor subcontractor through the local labor halls, which is required under TVA's labor agreements. These workers are paid by the hour. The income stream for these workers will therefore be adversely impacted by a work stoppage of any duration. In the event of a temporary work stoppage, these hourly workers would be furloughed and lose their paychecks. In the event of a longer work stoppage of uncertain duration, these hourly workers would be released from the project. As unemployed workers, they would have to return to the market and find another job. Approximately 55% of these workers live more than 50 miles from the Kingston site and unexpected job changes often impact these workers' housing and travel situations.

6. If work at Kingston is stopped and the current workers are released from the project without a job, it would be unlikely that the same skilled workers who are currently working onsite would return. That would have severe impacts on TVA in terms of cost and time to complete construction. With a project of this size and complexity, hiring qualified craft labor with a diversity of skill sets is essential. The hiring process for such a large number of skilled laborers is long and complex. In order to hire 2,000 workers, TVA has to process 3,000 to 4,000 workers because of

the issues that arise in the vetting process that disqualify candidates. For the Kingston project, the workforce has gradually escalated over time since the project began, thus allowing TVA to perform clearance activities such as finger printing and drug testing in manageable batches. Even assuming new craft labor could be retained, these new workers would have to be processed simultaneously through the same time-consuming clearance procedures, as opposed to the gradual processing that occurred previously. Any new skilled craft laborers would also need to be trained and integrated into the project at substantial cost and time. Bringing in a whole new slate of workers to a half-complete project is also extremely disruptive to the local labor community as well as labor continuity that was in existence prior to the work stoppage. This lack of labor continuity could threaten the proper installation of the equipment and ultimately plant performance.

7. A work stoppage of uncertain duration will also have a significant adverse effect on TVA's contracts and contract guarantees related to the Kingston project. For instance, in the event of a work stoppage, TVA's labor procurement subcontractor could reprice its contract and TVA would have no leverage to negotiate because it would have an immediate need to hire a large volume of workers. Contract performance guarantees would also be at risk. TVA's current labor contractor owns certain performance guarantees, and a new contractor is unlikely to assume performance guarantees for a half-finished project which has been demobilized for a period of time.

8. Plant performance is also likely to be adversely affected during a work stoppage. Gas turbines, generators, motors and transformers require strict storage and maintenance requirements to maintain serviceability and warranty. The warranties for such equipment are generally four years from delivery. Eighty-five percent of large equipment for the Kingston plant has now been delivered onsite, which means the warranties on these large pieces of equipment has

already begun to run. A work stoppage of indefinite duration will impair the value of these warranties for any extended period of disuse a shutdown would cause. The equipment itself may also deteriorate during a prolonged work stoppage, and that may result in an increased likelihood of early failure once the equipment is installed.

9. A work stoppage would have very significant adverse monetary and operational impacts that will continue even after the stoppage has been lifted. Resuming work, if feasible, following demobilization would require development of a new construction plan based on the duration of the shutdown and the availability of laborers who would have dispersed upon the standdown order. Depending on how long the stoppage lasts, the projected in-service date for the gas plant will be delayed for exponentially more days than the number of days of work stoppage and therefore is likely to have a cascading effect on TVA's ability to fulfill load demand.

Executed on this the 3rd day of September, 2026, in Hamilton County, Tennessee.

Roger Waldrep

# Tab G

# Notice of Appeal, Sept. 21, 2026 (R.77)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

APPALACHIAN VOICES,
CENTER FOR BIOLOGICAL DIVERSITY,
and SIERRA CLUB,
Plaintiffs,

v. No. 3:24-cv-00411-CLC-DCP

TENNESSEE VALLEY AUTHORITY,
Defendant.

**TENNESSEE VALLEY AUTHORITY'S NOTICE OF APPEAL**

Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B)(ii), notice is hereby given that Defendant Tennessee Valley Authority, an executive branch corporate agency and instrumentality of the United States, appeals to the United States Court of Appeals for the Sixth Circuit from the Judgment Order (Doc. 68) and the Memorandum (Doc. 67) entered on August 31, 2026, together with all findings and determinations embodied in the order, and all other orders and rulings adverse to Tennessee Valley Authority in this case.

Respectfully submitted,

*s/Maria V. Gillen*
Maria V. Gillen (TN BPR 030655)
Associate General Counsel
F. Regina Koho (TN BPR 029261)
Lane E. McCarty (TN BPR 028340)
Steven C. Chin (TN BPR 030011)
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

Amanda Rosemary Garcia, Esq.
O.W. Bussey, III, Esq.
Delaney King, Esq.
Jacqueline Hughwood, Esq.
1033 Demonbreun St., Suite 205
Nashville, Tennessee 37203
615.921.9470
agarcia@selc.org
tbussey@selc.org
dking@selc.org

Gregory D. Buppert, Esq.
Elizabeth M. Putfark, Esq.
201 West Main Street, Suite 14
Charlottesville, Virginia 22902
434.977.4090
gbuppert@selc.org
eputfark@selc.org

*Attorneys for Plaintiffs*

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority

# Tab H

## Precedent Agreement (R.44-2)(REDACTED; unredacted version available with the district court, *see* R. 45)

*Execution Copy*

# PRECEDENT AGREEMENT

This PRECEDENT AGREEMENT ("Precedent Agreement") is made and entered into this 12th day of AUGUST, 2021 ("Effective Date"), by and between East Tennessee Natural Gas, LLC, a Tennessee limited liability company with its principal place of business in Houston, Texas ("Transporter"), and Tennessee Valley Authority, a corporate agency of the United States created by an act of Congress with its principal place of business in Knoxville, Tennessee ("Shipper"). Transporter and Shipper are sometimes referred to herein individually as a ("Party"), or collectively as the ("Parties"). Capitalized terms used herein have the meaning for such terms as set forth: (i) in Section 1, "Definitions"; (ii) in Transporter's Tariff, where indicated herein; or (iii) as such terms are defined within other provisions of this Precedent Agreement.

WITNESSETH:

WHEREAS, Transporter owns and operates an interstate natural gas pipeline system which originates at receipt points with Texas Eastern Transmission, LP ("TETLP"), and other systems, in the State of Tennessee, and extends eastwardly in southerly and northerly directions through the states of Tennessee, Georgia, Virginia and North Carolina, with delivery points in each of such states;

WHEREAS, Shipper owns and operates electric generation facilities in the southeast region of the United States;

WHEREAS, subject to the terms and conditions of this Precedent Agreement, Shipper desires to obtain firm transportation capacity from Transporter to transport certain quantities of Shipper's natural gas to provide fuel for Shipper's Kingston Power Plant located in or near Kingston, Tennessee ("Shipper's Plant");

WHEREAS, to serve Shipper's firm transportation requirements, Transporter proposes to install certain pipeline and/or compression facilities (including appurtenant solar facilities) and associated equipment on its system to make available the additional firm transportation capacity desired by Shipper (the "Project"); and

WHEREAS, subject to the terms and conditions of this Precedent Agreement, Transporter is willing to endeavor to construct the Project and provide the firm transportation service for Shipper.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Transporter and Shipper agree to the following:

1. **Definitions**: The following terms used herein have the respective meanings set forth below or set forth in the sections referred to below:

**Business Day** - Monday through Friday, excluding Federal Banking Holidays in the United States

**Columbia Gulf** – Columbia Gulf Transmission, LLC

**Creditworthy** - A Party will be deemed Creditworthy if it has and continues to maintain: [redacted]

**Dth/d** - dekatherms per day

**FERC** or **Commission** – the Federal Energy Regulatory Commission or any successor agency

**FERC Certificate -** the certificate(s) of public convenience and necessity issued by FERC to Transporter pursuant to the Natural Gas Act, as amended, authorizing the Project

[redacted]

**Guaranty** – [redacted]

**Guarantor** – [redacted]

**Letter of Credit** - [redacted]

**Kingston Project** – Shipper's proposed project to install gas-fired capability to Shipper's Plant, which includes the proposed 1,450 megawatt combined-cycle gas plant and the natural gas pipeline to supply the units

**MDTQ** - Maximum Daily Transportation Quantity as defined in the Tariff

**Midwestern** – Midwestern Gas Transmission Company

[redacted]

**NGA** – the Natural Gas Act as amended

**Negotiated Rate Agreement** - the negotiated rate agreement between Transporter and Shipper in the form set forth as Exhibit A as further described in Section 5

**Pre-service Costs** – [redacted]

[redacted]

**Project** - has the meaning set forth in the recitals

**Qualified Financial Institution** - a U.S. financial institution, or a syndication of U.S. financial institutions, or the U.S. branch offices of a foreign financial institution, which is not a Party or a Party's Guarantor (or a subsidiary or affiliate of a Party or a Party's Guarantor) and which has a long-term senior unsecured debt rating of [redacted]

**Service Commencement Date** - the date that is the later of: (i) November 1, 2026; or (ii) the date that all of the conditions precedent set forth in Section 9(A) and 9(B) are satisfied or waived pursuant to the terms of Section 9

**Service Agreement** – the firm transportation service agreement between Transporter and Shipper pursuant to Rate Schedule FT-A in Transporter's Tariff in the form set forth as Exhibit B and as further described in Section 5

**Shipper Approvals** - any permits, authorizations and/or exemptions and supplements and amendments thereto necessary for Shipper to construct, own, operate and maintain the Kingston Project

**Shipper's Plant** - has the meaning set forth in the recitals

[redacted]

**Tariff** – Transporter's FERC Gas Tariff as effective from time to time

**TETLP** - has the meaning set forth in the recitals

**Transporter Approvals** - the permits, authorizations and/or exemptions including, without limitation the FERC Certificate, that Transporter determines are necessary for: (i) Transporter to construct, own, operate, and maintain the Project facilities necessary to provide the firm transportation service for Shipper contemplated herein; and (ii) Transporter to perform its obligations as contemplated in this Precedent Agreement, the Service Agreement and the Negotiated Rate Agreement

**Transporter's Capital Costs** – the capital cost of the Project based on Transporter's Exhibit K costs filed, or if not yet filed expected to be filed, as part of its Section 7(c) certificate application with the Commission, as amended from time to time, and then such amount shall be revised if necessary based on Transporter's post construction cost report filed with the Commission pursuant to Section 157.20 of the Commission's rules and regulations

2. **Transporter Approvals**: (A) [redacted]

(B) [redacted]

3. **Shipper Notice**: On or before December 31, 2021, Shipper shall notify Transporter in writing of: (i) any facilities that Shipper must construct, or cause to be constructed, in order for Shipper to utilize the firm transportation service contemplated in this Precedent Agreement; and (ii) Shipper Approvals

that are or may be required in connection with, and/or as a condition precedent to, this Precedent Agreement. If subsequent to the notification described in the preceding sentence and prior to issuance of the FERC Certificate Shipper determines there are additional Shipper Approvals that were not included in such notice, Shipper shall advise Transporter in writing no later than 20 days after Shipper identifies any such additional Shipper Approvals.

4. **Shipper Approvals:** (A) [redacted]

(B) [redacted]

[redacted]

(C) [redacted]

5. **Agreements**: (A) To effectuate the firm transportation service contemplated herein, no later than 10 days following the satisfaction or waiver of the condition precedent in Section 9(A)(ii), Shipper and Transporter shall execute the Service Agreement which: (i) specifies an MDTQ of 300,000 Dth/d, exclusive of fuel and loss requirements; (ii) specifies a primary term of 20 years; (iii) specifies primary points of receipt at TETLP, Columbia Gulf and Midwestern and a primary point of delivery at the interconnection between Transporter's facilities and Shipper's Plant ("Primary Delivery Point"); and (iv) shall, subject to Section 5(B), be subject to: (a) Transporter's maximum recourse rates; (b) Transporter's fuel and loss retention percentage, as defined in Transporter's Tariff applicable to the Project, the Service Agreement and the Negotiated Rate Agreement; and (c) any other charges and surcharges specified in Transporter's Tariff, with respect to clauses (iv)(a) through (iv)(c) inclusive, as applicable to Rate Schedule FT-A for service under the Service Agreement in connection with the Project. Service

pursuant to the Service Agreement will commence on the date specified by Transporter to Shipper pursuant to Section 6.

(B) Contemporaneously with the execution of the Service Agreement, Transporter and Shipper shall enter into the Negotiated Rate Agreement which reflects Shipper's election to pay negotiated rates for service under the Service Agreement. Subject to the terms and conditions of the Tariff and FERC approval of such negotiated rates, the rates specified in such Negotiated Rate Agreement shall be the rates applicable to service under the Service Agreement for the primary term of the Service Agreement as set forth in such Negotiated Rate Agreement. Shipper agrees that the Negotiated Rate Agreement constitutes prima facie evidence of Shipper's irrevocable election to pay a negotiated rate for service under the Service Agreement in lieu of Transporter's recourse rates for the term set forth in such Negotiated Rate Agreement.

(C) Transporter and Shipper shall execute, no later than July 1, 2025, an interconnect agreement with respect to the Primary Delivery Point, which interconnection agreement shall address the obligations of the parties to construct, own, operate and maintain the facilities that will comprise the interconnection between Transporter's system and Shipper's Plant.

6. **Service Commencement Date**: Transporter shall notify Shipper of the Service Commencement Date. On and after the Service Commencement Date, Transporter will stand ready to provide service for Shipper pursuant to the

terms of the Service Agreement and, subject to the terms of the Service Agreement and Negotiated Rate Agreement, Shipper will pay Transporter for all applicable charges associated with the Service Agreement.

7. **Transporter's Preliminary Activities**: (A) Transporter will undertake the design of facilities and any other preparatory actions necessary for Transporter to complete and file its application(s) for the FERC Certificate with the Commission. Prior to satisfaction of the conditions precedent set forth in Section 9, Transporter shall have the right, but not the obligation, to proceed with the necessary design of facilities, acquisition of materials, supplies, properties, rights-of-way and any other necessary preparations to implement the firm transportation service under the Service Agreement and Negotiated Rate Agreement as contemplated in this Precedent Agreement.

(B) [redacted]

[redacted]

8. **Construction of Project Facilities**: Upon satisfaction of the conditions precedent set forth in Sections 9(A)(i), 9(A)(ii), 9(A)(iii), 9(A)(iv) and 9(B), or waiver of the same by Transporter or Shipper, as applicable, Transporter shall proceed with due diligence to construct the authorized Project facilities and to implement the service contemplated in this Precedent Agreement on or about November 1, 2026. Notwithstanding Transporter's due diligence, if Transporter is unable to commence the firm transportation service for Shipper as contemplated herein by November 1, 2026, Transporter will continue to proceed with due diligence to complete arrangements for such firm transportation service, and commence the firm transportation service for Shipper at the earliest practicable date thereafter. Transporter will not be liable in damages to Shipper pursuant to this Precedent Agreement and, except as otherwise set forth in Section 11, this Precedent Agreement, the Service Agreement and the Negotiated Rate Agreement are not subject to termination if Transporter is not able to complete the construction of such authorized Project facilities and commence the firm transportation service contemplated herein by November 1, 2026.

9. **Conditions Precedent**: Subject to and in accordance with the provisions of Section 6 of this Precedent Agreement, commencement of service under the Service Agreement, and Transporter's and Shipper's rights and

obligations under the Service Agreement, are expressly made subject to satisfaction or waiver of all of the following conditions precedent set forth in Sections 9(A) and 9(B). The Parties agree that only (i) Transporter shall have the right to waive the conditions precedent set forth in Section 9(A); and (ii) Shipper shall have the right to waive the conditions precedent set forth in Section 9(B). Transporter shall promptly notify Shipper in writing (or by email) after each of the conditions precedent in Section 9(A) have been satisfied or waived, and Shipper shall promptly notify Transporter in writing (or by email) after each of the conditions precedent in Section 9(B) have been satisfied or waived.

(A) The conditions precedent related to Transporter are:

(i) Transporter's receipt by [redacted] of approval from its Management Committee, or similar governing body, at its sole and absolute discretion, of the transaction contemplated in this Precedent Agreement and to pursue further development of the Project;

(ii) Transporter's receipt and acceptance by [redacted] of the FERC Certificate necessary to provide the firm transportation service contemplated herein and in the Service Agreement and to charge the recourse rates requested for firm transportation service and fuel and loss reimbursement applicable to the Project, as contemplated in this Precedent

Agreement, the Service Agreement and the Negotiated Rate Agreement;

(iii) Transporter's receipt of all Transporter Approvals other than those specified in Section 9(A)(ii);

(iv) Transporter's procurement of all necessary rights-of-way easements or permits, however styled, in form and substance acceptable to Transporter; and

(v) Transporter's completion of construction of the necessary Project facilities required to render service for Shipper pursuant to the Service Agreement and Transporter having received FERC authorization to place such facilities into gas service.

(B) The conditions precedent related to Shipper are Shipper's:

(i) receipt by September 30, 2023 of approval from its Board of Directors, at its sole and absolute discretion, to enter into, and perform its obligations pursuant to the Service Agreement and the Negotiated Rate Agreement; and

(ii) completion by July 31, 2023 of environmental reviews and required agency consultations for the construction of the Kingston Project in order to meet requirements under the National Environmental Policy Act, Section 7 of the

Endangered Species Act, and Section 106 of the National Historic Preservation Act, and issuance of the Record of Decision in order to meet requirements under the National Environmental Policy Act.

(C) Unless otherwise provided for herein, the Commission authorization(s) and approval(s) contemplated in Section 9(A)(ii) of this Precedent Agreement must be issued in form and substance satisfactory to both Parties hereto. For the purposes of this Precedent Agreement, such Commission authorization(s) and approval(s) shall be deemed satisfactory if issued or granted in form and substance as requested, or if issued in a manner acceptable to Transporter and such authorization(s) and approval(s), as issued, will not have a material adverse effect on Shipper. Shipper shall notify Transporter in writing not later than 15 days after the issuance of the FERC Certificate if such FERC Certificate is not satisfactory to Shipper. All other Transporter Approvals must be issued in form and substance acceptable to Transporter. All Transporter Approvals contemplated in Section 9(A) must be duly granted by the Commission or other governmental agency or authority having jurisdiction, and must be final and no longer subject to rehearing or appeal; provided, however, Transporter may waive the requirement that such authorization(s) and approval(s) be final and no longer subject to rehearing or appeal.

10. **Pre-service Costs**: (A) [redacted]

[redacted]

(B) [redacted].

11. **Termination**: (A) If the conditions precedent set forth in Sections 9(A)(i), 9(A)(ii), 9(A)(iii), 9(A)(iv) or 9(B) have not been fully satisfied or waived by Transporter or Shipper, as applicable, pursuant to the terms of Section 9, by the earlier of the applicable dates specified therein or [redacted] or such other date as mutually agreed upon, and this Precedent Agreement has not been terminated pursuant to Sections 11(B), 11(C) or 11(D), then either Transporter or Shipper may thereafter terminate this Precedent Agreement and, as applicable, the related Service Agreement and Negotiated Rate Agreement by giving 120 days prior written notice of its intention to terminate to the non-terminating Party; provided, if the condition(s) precedent are satisfied, or waived by Transporter or Shipper, as applicable, pursuant to the terms of Section 9, within such 120-day notice period, then termination will not be effective.

(B) [redacted]

[redacted]

(C) [redacted]

(D) If this Precedent Agreement has not been earlier terminated pursuant to Sections 11(A), 11(B) or 11(C), then this Precedent Agreement will terminate by its terms on the Service Commencement Date, and thereafter Transporter's and Shipper's rights and obligations related to the firm transportation service contemplated herein shall be determined pursuant to the terms and

conditions of the Service Agreement, the Negotiated Rate Agreement and Transporter's Tariff unless otherwise expressly set forth herein.

12. **Credit Requirements**: On or within 5 Business Days after the Effective Date of this Precedent Agreement, Shipper shall satisfy the creditworthiness requirements as set forth in this Section 12.

(A) (i) Creditworthiness Standard. [redacted]

(ii) [redacted]

(iii) [redacted]

(B) Guaranty. [redacted]

[redacted]

(C) Letter of Credit. [redacted]

i) [redacted]

[redacted]

(ii) [redacted]

(iii) [redacted]

(D) Tariff Credit Provisions Apply. [redacted]

(E) Transporter Notification. [redacted]

[redacted]

(F) Failure to Comply. [redacted]

(G) Term of Credit Provisions. [redacted]

(H) Replacement Shipper Creditworthiness. [redacted]

[redacted]

[redacted]

[redacted]

13. **Assignment**: Any company which succeeds by purchase, merger, or consolidation of title to the properties, substantially as an entirety, of Transporter or Shipper, will be entitled to the rights and will be subject to the obligations of its predecessor in title under this Precedent Agreement. Otherwise, neither Shipper nor Transporter may assign any of its rights or obligations under this Precedent Agreement without the prior written consent of the other Party hereto, which consent may be provided or withheld at the sole and absolute discretion of such other Party. Notwithstanding the foregoing, each Party shall have the right, with the written consent of the other Party, which consent shall not be

unreasonably withheld or delayed, to pledge or assign its rights under this Precedent Agreement, the Service Agreement and/or the Negotiated Rate Agreement as collateral security for indebtedness incurred in connection with the Project.

14. **<u>Limitation on Damages</u>**: [redacted]

15. **<u>RESERVED</u>**.

16. **<u>Notices</u>**: Except as herein otherwise provided, any notice, request, demand, statement, or bill provided for in this Precedent Agreement, or

any notice which either Party desires to give to the other, must be in writing and will be considered duly delivered when (i) mailed or sent by registered, certified mail or overnight courier to the other Party's Post Office address set forth below or (ii) delivered by either facsimile or electronic mail on the day such electronic communication is transmitted; provided if any such electronic transmission occurs after the end of the receiving Party's normal business hours delivery shall be deemed to have occurred on the next Business Day, and provided, further, any such electronic communication must also be delivered by overnight courier on the next Business Day to the other Party's Post Office address set forth below:

Transporter: East Tennessee Natural Gas, LLC
2701 North Rocky Point Drive, Suite 1050
Tampa, Florida 33607
[redacted]

Shipper: Tennessee Valley Authority
1101 Market Street
Chattanooga, Tennessee 37402
Attn: Karen Stampfli
Email: kstampfli@tva.gov

or at such other address as either Party designates by written notice.

17. **Miscellaneous Provisions**:

(A) This Precedent Agreement may not be modified or amended unless the Parties execute a written agreement to that effect.

(B) Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person not a Party hereto any rights, remedies or obligations under or by reason of this Precedent Agreement.

(C) Each and every provision of this Precedent Agreement shall be considered as prepared through the joint efforts of the Parties and shall not be construed against either Party as a result of the preparation or drafting thereof. It is agreed that no consideration shall be given or presumption made on the basis of who drafted this Precedent Agreement or any specific provision hereof.

(D) The recitals and representations appearing first above are hereby incorporated in and made a part of this Precedent Agreement. References in this Precedent Agreement to sections and/or section numbers refer to sections and/or section numbers of this Precedent Agreement unless otherwise indicated.

(E) This Precedent Agreement shall be governed, construed, and interpreted in accordance with the federal laws of the United States of America. In the event such federal laws state no rule of decision with respect to any particular Dispute or claim related to this Precedent Agreement, the law of the State of Tennessee, except for Tennessee's choice of law provisions, will apply.

(F) The terms and provisions contained in this Precedent Agreement, the Service Agreement and the Negotiated Rate Agreement constitute the entire agreement of the Parties, and there are no prior or other contemporaneous

agreements, understandings, warranties, representations, covenants, obligations, promises, assurances, or conditions precedent or subsequent or otherwise, except those expressly set out in this Precedent Agreement, the Service Agreement and the Negotiated Rate Agreement.

(G) This Precedent Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

(H) This Precedent Agreement shall become effective on the Effective Date and shall continue in effect until terminated pursuant to the terms stated herein.

(I) EACH PARTY HERETO WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY JUDICIAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS PRECEDENT AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS PRECEDENT AGREEMENT.

(J) If a court of competent jurisdiction declares any provision of this Precedent Agreement unenforceable, then that provision shall be severed from this Precedent Agreement, which shall otherwise remain in full force and effect and be construed as if it did not contain the severed provision; provided, however, that if severing such provision from this Precedent Agreement has a material adverse effect on the rights or obligations of either Party as set forth in this Precedent Agreement, then the Parties agree to negotiate in good faith

replacement terms that are consistent with the court's declaration or directive and that maintain the relative economic, commercial and legal positions of, and risks to, the Parties as reflected in this Precedent Agreement as of the Effective Date first set forth above.

(K) Unless otherwise required by the context in which any term appears: (i) the gender of all words used herein shall include the masculine, feminine and neuter and the singular shall include the plural and vice versa; (ii) unless otherwise specified, references to "Sections" shall be the Sections of this Precedent Agreement, as the same may be amended, modified, supplemented or replaced from time to time hereunder; (iii) the words "herein," "hereof" and "hereunder" shall refer to this Precedent Agreement as a whole and not to any particular Section or subsection of this Precedent Agreement; (iv) references to any agreement, document or instrument shall mean a reference to such agreement, document or instrument as the same may be amended, modified, supplemented or replaced from time to time; (v) the use of the word "including" in this Precedent Agreement shall be construed to mean "including, without limitation" or "including but not limited to"; (vi) references to a law or regulation shall mean a reference to such law or regulation as the same may be amended, modified, supplemented or restated and be in effect from time to time; and (vii) the headings contained herein are used solely for convenience and do not constitute a part of this Precedent Agreement nor should they be used to aid in any manner to construe or interpret this Agreement.

(L) **Representations and Warranties.** Each Party represents and warrants to each other that: (i) this Precedent Agreement has been duly executed and delivered by such Party; (ii) the execution, delivery and performance of this Precedent Agreement by such Party have been and remain duly authorized by all necessary corporate or limited liability company action, as applicable; and (iii) this Precedent Agreement constitutes the legal, valid, binding and enforceable obligation of such Party, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws and by general principles of equity.

(M) **Affirmative Action and Equal Opportunity**. To the extent applicable, this Agreement incorporates by reference the Affirmative Action for Disabled Veterans and Veterans of the Vietnam-Era clause, 41 C.F.R. § 60-250.4; the Affirmative Action for Handicapped Workers clause, 41 C.F.R. § 60-741.4; the Equal Opportunity clause, 41 C.F.R. § 60-1.4; and the Discrimination on the Basis of Age clause, 18 C.F.R. § 1316.6; and all amendments thereto and all applicable regulations, rules, and orders issued thereunder. Transporter shall comply with applicable regulatory requirements, including information reports and affirmative action programs.

N. **Small Business Policy**. To the extent applicable, the requirements of 15 U.S.C § 637(d)(3) are incorporated by reference.

O. **Certification for Contracts, Grants, Loans, and Cooperative Agreements**. Transporter's representative, by signing the agreement to which this

certification is attached, certifies, to the best of his or her knowledge and belief, that:

(1) No Federal appropriated funds have been paid or will be paid by or on behalf of Transporter to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of this Agreement or the extension, continuation, renewal, amendment, or modification of this Agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this Agreement, Transporter shall complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this Agreement was made or entered into. Submission of this certification is a prerequisite for making or entering into this Agreement imposed by 31 U.S.C. § 1352.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties hereto have caused this Precedent Agreement to be duly executed by their duly authorized officers as of the Effective Date.

**East Tennessee Natural Gas, LLC**

By: ______________________
Robert Huffman
President

**Tennessee Valley Authority**

By: ______________________
Douglas Perry
Senior Vice President
Commercial Energy Solutions

**EXHIBIT A**

NEGOTIATED RATE AGREEMENT

ENBRIDGE

**Enbridge**
5400 Westheimer Court
Houston, Texas 77056

[DATE]

Mr. ___________
Vice President
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902

Re: Negotiated Rate Agreement for Service Agreement Contract No. 840164 ("Negotiated Rate Agreement")

Dear Mr. __________:

East Tennessee Natural Gas, LLC ("Transporter") and Tennessee Valley Authority ("Shipper") are parties to Transporter's Service Agreement Contract No. ________ under Transporter's Rate Schedule FT-A. Transporter and Shipper desire to enter into this "Negotiated Rate Agreement" to set forth the rates to be applicable to service under the Service Agreement.

Transporter and Shipper hereby agree to the rate provisions set forth on the attached tariff record and acknowledge that, subject to and upon approval by the Federal Energy Regulatory Commission ("FERC") of a filed tariff record reflecting such provisions, all of the rate provisions contained therein will be applicable to the Service Agreement as negotiated rates ("Negotiated Rates"). If FERC approval of a filed tariff record reflecting all of the provisions on the attached tariff record is not obtained without condition or modification, this Agreement shall be null and void and of no further effect and service under the Service Agreement shall be provided subject to Transporter's maximum recourse rates in effect from time to time.

[redacted]

[redacted]

If the forgoing accurately sets forth your understanding of the matter covered herein, please so specify by having a duly authorized representative sign in the space provided below and returning an original signed copy to the undersigned.

Sincerely,

East Tennessee Natural Gas, LLC

ACCEPTED AND AGREED TO:
this ________ day of _____________, 202_

Tennessee Valley Authority

By:_________________________________

STATEMENT OF NEGOTIATED RATES [redacted]

| | |
|---|---|
| Shipper Name: | Tennessee Valley Authority |
| Service Agreement: | Contract No. __________ ("Service Agreement") [redacted] |
| Term of Negotiated Rate: | [redacted] |
| Rate Schedule: | FT-A (Ridgeline) |
| Maximum Daily Transportation Quantity: | [redacted] |
| Primary Receipt Point(s): | [redacted] |
| Primary Delivery Point(s): | Kingston [add meter number] |
| Reservation Rate: | [redacted] |
| Usage Rates: | [redacted] |
| Fuel: | [redacted] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted].

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

> [redacted]

> [redacted]

> [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted].

**EXHIBIT B**

SERVICE AGREEMENT

FIRM TRANSPORTATION AGREEMENT
(For Use Under Rate Schedules FT-A and FT-GS)

Date:__________________________, Contract No.__________________

SERVICE AGREEMENT

This AGREEMENT is entered into by and between East Tennessee Natural Gas, LLC, ("Transporter") and _____________________________________ ("Shipper").

WHEREAS, [This and an additional clause(s) may be included to describe the historical or factual context of the Agreement, to describe or identify a precedent agreement, and any other agreements if applicable, between Transporter and Shipper related to the Agreement, and/or describe or define the facilities necessary to provide service under the Agreement, and will not include binding consideration.]

[***In the event that the capacity was awarded as Interim Capacity pursuant to Section 5.8(c) of the General Terms and Conditions of Transporter's Tariff, the following language will be included as a Whereas clause in Shipper's Agreement:*** "The service provided to Shipper under this Agreement will utilize capacity that was acquired by Shipper as Interim Capacity pursuant to the provisions of Section 5.8(c) of the General Terms and Conditions of Transporter's Tariff."]

NOW THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties do agree as follows:

1. Transporter shall deliver and Shipper shall take and pay for service up to the Maximum Daily Transportation Quantity stated on Exhibit A attached hereto at the Receipt Point(s) and Delivery Point(s) listed on Exhibit A attached hereto pursuant to the terms of this Agreement and subject to the Rate Schedule in Transporter's Tariff indicated on Exhibit A as applicable to this agreement and subject to the General Terms and Conditions of Transporter's Tariff. Exhibit A, the applicable Rate Schedule, and the General Terms and Conditions of Transporter's Tariff are incorporated herein by reference and made a part hereof.

   [***IN THE EVENT THAT A PRECEDENT AGREEMENT FOR A NEW OR AN EXPANSION PROJECT CONTAINS CREDIT PROVISIONS APPLICABLE TO SHIPPER'S CAPACITY RELATED TO SUCH PROJECT, THE FOLLOWING LANGUAGE SHALL BE INCLUDED IN SHIPPER'S SERVICE AGREEMENT.*** "The credit requirements applicable to this Agreement are set forth in that certain Precedent Agreement dated ___________ between Transporter and Shipper related to this Agreement."]

2. This Agreement shall be effective as of ___________[this blank may include a date certain, a date either earlier or later than a specified date certain based on the completion of construction of facilities necessary to provide service under the Agreement, a date set forth in or established by a relevant order from the Federal Energy Regulatory Commission or a commencement date as defined in a precedent agreement between Shipper and Transporter] and shall remain in force and effect until and including ___________[or, when applicable, "shall continue for a term of ____ years"] ("Primary Term"); provided however, that if the Primary Term is one Year or more, then the contract shall remain in force and effect and the contract term will automatically roll-over for additional five Year increments ("Secondary Term") [***In the event that the capacity was awarded as Interim Capacity pursuant to Section 5.8(c) of the General Terms and Conditions of Transporter's Tariff, the following phrase will be included in Shipper's Agreement:*** ", but in no event beyond ________," unless Shipper, one Year prior to the expiration of the Primary Term or a Secondary Term, provides written notice to Transporter of either (1) its intent to terminate the contract upon expiration of the then current term or (2) its desire to exercise its right-of-first-refusal in accord with Section 7.3 of Transporter's General Terms and Conditions. [In the event that Transporter and Shipper agree to a fixed term, the evergreen and notice of termination language shall be omitted from Shipper's Agreement.] Provided further, if the Commission or other governmental body having jurisdiction over the service rendered pursuant to this Agreement authorizes abandonment of such service, this Agreement shall terminate on the abandonment date permitted by the Commission or such other governmental body. If any provision of this Agreement is declared null and void, or voidable, by a court of competent jurisdiction, then that provision will be considered severable at Transporter's option; and if the severability option is exercised, the remaining provisions of the Agreement shall remain in full force and effect.

   Shipper shall have a right-of-first-refusal pursuant to Section 7.3(b) of Transporter's General Terms and Conditions with respect to each Secondary Term under this Agreement,

provided that the Agreement qualifies as a ROFR Agreement as defined in Section 1 of Transporter's General Terms and Conditions.

3. The applicable maximum rate(s) and all other applicable charges and surcharges specified in the Notice of Rates in Transporter's FERC Gas Tariff and in the Rate Schedule specified in Exhibit A shall apply to service pursuant to this Agreement except as provided to the contrary in any written or electronic agreement(s) between Transporter and Shipper in effect during the term of this Agreement.

   Shipper agrees that Transporter shall have the unilateral right to file with the appropriate regulatory authority and make changes effective in the rates and charges applicable to service pursuant to the Rate Schedule under which this service is rendered and in any provisions of Transporter's General Terms and Conditions as they may be revised or replaced from time to time. Without prejudice to Shipper's right to contest such changes, Shipper agrees to pay the effective rates and charges for service rendered pursuant to this Agreement. Transporter agrees that Shipper may protest or contest the aforementioned filings, or may seek authorization from duly constituted regulatory authorities for adjustment of Transporter's existing FERC Gas Tariff as may be found necessary to assure Transporter just and reasonable rates.

4. Unless otherwise required in the Tariff, all notices shall be in writing and shall be deemed given when sent to Transporter at the address below and to Shipper at the address shown on Exhibt A or to such other address as either party shall designate or shall be transmitted via facsimile. Shipper or Transporter may change such addresses or other information by written notice to the other without the necessity of amending this Agreement.

   Transporter:

5. The interpretation and performance of this Agreement shall be in accordance with and controlled by the laws of the state of Tennessee, without regard to choice of law doctrine that refers to the laws of another jurisdiction.

6. As of the effective date provided above, this Agreement supersedes and cancels the Agreement(s) between Shipper and Transporter dated ____________.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective Officers and/or Representatives thereunto duly authorized to be effective as of the date stated above.

| | |
|---|---|
| SHIPPER: ______________________ | EAST TENNESSEE NATURAL GAS, LLC |
| By:____________________________ | By:____________________________ |
| Title:_________________________ | Title:_________________________ |

EXHIBIT A, DATED ________________,
TO THE SERVICE AGREEMENT UNDER RATE SCHEDULE ____
BETWEEN EAST TENNESSEE NATURAL GAS, LLC ("Transporter")
AND ___________________________ ("Shipper"),
DATED ________________

Exhibit A Effective Date: __________

Maximum Daily
Transportation Quantity: ________________
Proposed Commencement Date: _______________

| Primary Receipt Point(s): Name | Meter No. | MDRO | Location County, State |
|---|---|---|---|
| _______________ | __________ | ___________ | ____________ |
| _______________ | __________ | ___________ | ____________ |
| _______________ | __________ | ___________ | ____________ |

| Primary Delivery Point(s): Name | Meter No. | MDDO | Location County, State |
|---|---|---|---|
| _______________ | __________ | ___________ | ____________ |
| _______________ | __________ | ___________ | ____________ |
| _______________ | __________ | ___________ | ____________ |

* Transporter shall not be obligated to deliver more Cubic Feet of gas to any Shipper than the quantity calculated using 1030 Dth per million Cubic Feet.

EXHIBIT A (Continued)

Notices not made via LINK® shall be made to:

Shipper(2)

______________________________________

______________________________________

______________________________________

Attn: ________________________________

Invoices

______________________________________

______________________________________

______________________________________

Attn: ________________________________

(This Exhibit A supersedes and cancels Exhibit A dated _____________ to the Firm Transportation Agreement dated __________________.)

| | |
|---|---|
| EAST TENNESSEE NATURAL GAS, LLC | (SHIPPER) |
| BY:_____________________________ | BY:_____________________________ |
| TITLE:__________________________ | TITLE:__________________________ |

## EXHIBIT C

## IRREVOCABLE STANDBY LETTER OF CREDIT

**Letter of Credit No**:___________

**Date:**_________________, 20__

**Date of Expiry:** ___________, 20__

**Beneficiary:**
East Tennessee Natural Gas, LLC
5400 Westheimer Court
Houston, TX 77056

**Account Party:**
(Complete Legal Name)
*(Address)*
*(City, State, Zip)*

Attn: Credit Manager

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

3

ISSUING BANK SIGNATURE

*EXECUTION COPY*

# AMENDMENT TO PRECEDENT AGREEMENT

This Amendment to the Precedent Agreement ("Amendment") is made and entered into this __ day of December, 2022 between East Tennessee Natural Gas, LLC, a Tennessee limited liability company with its principal place of business in Houston, Texas ("Transporter") and Tennessee Valley Authority, a corporate agency of the United States created by an act of Congress with its principal place of business in Knoxville, Tennessee ("Shipper"). Transporter and Shipper are sometimes referred to herein as "Party" or collectively as the "Parties".

**WHEREAS**, the Parties entered into that certain Precedent Agreement dated August 12, 2021 (the "Precedent Agreement") for the purpose of setting forth the terms and conditions according to which Transporter would install certain pipeline and/or compression facilities (including appurtenant solar facilities) and associated equipment on its system to make available the additional firm transportation capacity desired by Shipper, and Shipper would take and pay for such firm transportation service;

**WHEREAS**, upon the Effective Date (defined below), the Parties wish to amend the Precedent Agreement to include a park feature in the firm transportation service contemplated in the Precedent Agreement, update the form of Negotiated Rate Agreement to reflect the park feature and changes in Project facilities and costs, identify information that Shipper has agreed to provide in support of Transporter's efforts to obtain all Transporter Approvals, and make other related changes as discussed more fully herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, Transporter and Shipper hereby agree as follows:

A. Definitions. All capitalized terms used but not defined or modified herein shall have the meanings ascribed thereto in the Precedent Agreement.

B. Amendments Regarding the Park Feature. Upon the occurrence of the condition precedent set forth in Paragraph C hereof, the Precedent Agreement is amended as follows:

1. The recitals of the Precedent Agreement are hereby amended by deleting the fourth Whereas clause in its entirety and replacing it with the following.

> "WHEREAS, to serve Shipper's firm transportation requirements, Transporter proposes to install certain pipeline and/or compression facilities (including appurtenant solar facilities) and associated equipment on its system to make available the additional firm transportation capacity and park feature desired by Shipper (the "Project"); and"

2. Section 1 of the Precedent Agreement is hereby amended by adding the following definitions.

> **MHQ** – the maximum hourly quantity for deliveries at the Primary Delivery Point under the Service Agreement.

**MPQ** – the maximum park quantity at the Primary Delivery Point under the Service Agreement

3. Section 1 of the Precedent Agreement is hereby amended by deleting the definition of "Service Agreement" in its entirety and replacing it with the following.

"**Service Agreement** – the firm transportation service agreement between Transporter and Shipper pursuant to a new rate schedule in Transporters Tariff that is substantially similar to Rate Schedule FT-A in Transporter's Tariff, except that the new rate schedule will include a park feature and describe the MPQ and MHQ applicable to the park feature, substantially in the form set forth as Exhibit B, and as further described in Section 5"

4. Section 2(B) of the Precedent Agreement is hereby amended by adding the following at the end of the section.

[redacted]

5. Section 5(A) of the Precedent Agreement is hereby amended by deleting the section in its entirety and replacing it with the following.

"(A) To effectuate the firm transportation service contemplated herein, no later than 10 business days following the satisfaction or waiver of the condition precedent in Section 9(A)(ii), Shipper and Transporter shall execute the Service Agreement which: (i) specifies an MDTQ of 300,000 Dth/d, exclusive of fuel and loss requirements; (ii) specifies a primary term of 20 years; (iii) specifies primary points of receipt at TETLP, Columbia Gulf and Midwestern and a primary point of delivery at the interconnection between Transporter's facilities and Shipper's Plant ("Primary Delivery Point"); (iv) specifies an MPQ of 95,000] Dth; (v) [redacted] and (vi) shall, subject to Section 5(B), be subject to: (a) Transporter's maximum recourse rates; (b) Transporter's fuel and loss retention percentage, as defined in Transporter's Tariff applicable to the Project, the Service Agreement and the Negotiated Rate Agreement; and (c) any other charges and surcharges specified in Transporter's Tariff, with respect to clauses (vi)(a) through (vi)(c) inclusive, as applicable to service under the Service Agreement in connection with the Project. Service pursuant to the Service Agreement will commence on the date specified by Transporter to Shipper pursuant to Section 6."

6. Section 5 of the Precedent Agreement is hereby amended by adding the following subsection (D).

"(D) [redacted]

7. Exhibit A to the Precedent Agreement is hereby amended by replacing all references to "Rate Schedule FT-A" in the exhibit with "Rate Schedule [___]".

8. The Reservation Rate section of Exhibit A to the Precedent Agreement is hereby amended by replacing [redacted]

9. Footnote 7 of Exhibit A to the Precedent Agreement is hereby amended by deleting the first sentence of subsection (A) and replacing it with the following:

[redacted]

C. Condition Precedent. The amendments set forth in Paragraph B will be effective on the date (the "Effective Date") that the following condition precedent is satisfied or waived by Transporter.

1. [redacted].

D. General Amendment. Upon the execution of this Amendment, the Precedent Agreement is amended as follows:

1. Section 9(B)(i) is hereby amended by replacing "Board of Directors, at its sole and absolute discretion" with "its Chief Executive Officer, or his or her delegee, in his or her sole and absolute discretion".

E. Representation and Warranty. Shipper represents and warrants that its Chief Executive Officer, and his or her delegees, have been duly authorized by all necessary corporate action to approve the transaction contemplated in the Precedent Agreement, including approval for Shipper to enter into, and perform its obligations pursuant to the Service Agreement and the Negotiated Rate Agreement.

F. Continuing Effect of the Precedent Agreement. All references to the Precedent Agreement shall refer to the Precedent Agreement as amended by this Amendment. Except as expressly amended hereby, all of the provisions of the Precedent Agreement shall remain in full force and effect and are hereby in all respects ratified and confirmed.

G. One Agreement; Counterparts; Signatures. The Precedent Agreement, as amended by this Amendment, will be construed as one agreement. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original and all of which, collectively, shall be one and the same instrument. This Amendment may be signed by facsimile signatures or other electronic delivery of an image file (such as a .pdf file) reflecting the execution hereof, and, if so

signed: (a) may be relied on by each party as if the document were a manually signed original and (b) will be binding on each party for all purposes.

H. Captions. The headings to the sections of this Amendment have been inserted for convenience of reference only and shall in no way modify or restrict any provisions hereof or be used to construe any such provisions.

I. Governing Law. This Amendment shall be governed, construed an interpreted in accordance with the federal laws of the United States of America. In the event such federal laws state no rule of decision with respect to any particular dispute or claim related to this Amendment, the law of the State of Tennessee, except for Tennessee's choice of law provisions, will apply.

[*Signature Page Follows*]

*EXECUTION COPY*

**IN WITNESS WHEREOF**, the Parties have caused their duly authorized representatives to execute this Amendment, effective as of the Effective Date.

**East Tennessee Natural Gas, LLC**

By: ______________________________

Robert Huffman
President

**Tennessee Valley Authority**

By: ______________________________

Doug Perry
Senior Vice President,
Commercial Energy Solutions

# SECOND AMENDMENT TO PRECEDENT AGREEMENT

This Second Amendment to the Precedent Agreement ("Second Amendment") is made and entered into this 19th day of July, 2023 between East Tennessee Natural Gas, LLC, a Tennessee limited liability company with its principal place of business in Houston, Texas ("Transporter") and Tennessee Valley Authority, a corporate agency of the United States created by an act of Congress with its principal place of business in Knoxville, Tennessee ("Shipper"). Transporter and Shipper are sometimes referred to herein as "Party" or collectively as the "Parties".

**WHEREAS**, the Parties entered into that certain Precedent Agreement dated August 12, 2021, as amended by the Amendment to Precedent Agreement dated December 21, 2022 (collectively, the "Precedent Agreement") for the purpose of setting forth the terms and conditions according to which Transporter would install certain pipeline and/or compression facilities (including appurtenant solar facilities) and associated equipment on its system to make available the additional firm transportation capacity desired by Shipper, and Shipper would take and pay for such firm transportation service; and

**WHEREAS**, the Parties wish to amend the Precedent Agreement to extend the dates of Shipper's conditions precedent to reflect changes in Shipper's timeframe for completion and review of Shipper's Environmental Impact Statement and make other related changes as discussed more fully herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, Transporter and Shipper hereby agree as follows:

A. Definitions. All capitalized terms used but not defined or modified herein shall have the meanings ascribed thereto in the Precedent Agreement.

B. Upon the execution of this Second Amendment, the Precedent Agreement is amended as follows:

1. Section 4(B) of the Precedent Agreement is hereby amended by replacing [redacted] in the second line of the section. Also, all references to "Board of Directors" is hereby replaced with "Board of Directors, or its delegee."

2. Section 8 of the Precedent Agreement is hereby amended by adding [redacted] in the sixth line of the section.

3. Section 9(A)(ii) is hereby amended by replacing [redacted].

4. Section 9(B)(i) is hereby amended by replacing [redacted] Also, reference to "its Chief Executive Officer, or his or her delegee, in his or her sole and absolute discretion" is hereby replaced with "Board of Directors, or its delegee."

5. Section 9(B)(ii) is hereby amended by replacing [redacted].

6. Section 10(A) is hereby amended by replacing [redacted] and by replacing [redacted]

7. Section 11(B) is hereby amended by replacing [redacted] Also, all references to "Board of Directors" are hereby replaced with "Board of Directors, or its delegee."

C. <u>Representation and Warranty</u>. Shipper represents and warrants that its Chief Executive Officer, and his or her delegees, have been duly authorized by all necessary corporate action to enter into this Second Amendment to Precedent Agreement and following completion and satisfaction of all applicable conditions precedent within the Precedent Agreement (as amended), [redacted] has the authority to enter into, and perform its obligations pursuant to the Service Agreement and the Negotiated Rate Agreement.

D. <u>Continuing Effect of the Precedent Agreement</u>. All references to the Precedent Agreement shall refer to the Precedent Agreement as amended by this Second Amendment. Except as expressly amended hereby, all of the provisions of the Precedent Agreement shall remain in full force and effect and are hereby in all respects ratified and confirmed.

E. <u>One Agreement; Counterparts; Signatures</u>. The Precedent Agreement, as amended by this Second Amendment, will be construed as one agreement. This Second Amendment may be executed in multiple counterparts, each of which shall be deemed an original and all of which, collectively, shall be one and the same instrument. This Second Amendment may be signed by facsimile signatures or other electronic delivery of an image file (such as a .pdf file) reflecting the execution hereof, and, if so signed: (a) may be relied on by each party as if the document were a manually signed original and (b) will be binding on each party for all purposes.

F. <u>Captions</u>. The headings to the sections of this Second Amendment have been inserted for convenience of reference only and shall in no way modify or restrict any provisions hereof or be used to construe any such provisions.

G. <u>Governing Law</u>. This Second Amendment shall be governed, construed an interpreted in accordance with the federal laws of the United States of America. In the event such federal laws state no rule of decision with respect to any particular dispute or claim related to this Second Amendment, the law of the State of Tennessee, except for Tennessee's choice of law provisions, will apply.

**IN WITNESS WHEREOF**, the Parties have caused their duly authorized representatives to execute this Second Amendment, effective as of the Effective Date.

| | |
|---|---|
| **East Tennessee Natural Gas, LLC** | **Tennessee Valley Authority** |
| By: ______________________________ | By: ______________________________ |
| Robert Huffman | Jacinda B. Woodward |
| President | Sr. V. P. Power Operations |

**THIRD AMENDMENT TO PRECEDENT AGREEMENT**

This Third Amendment to the Precedent Agreement ("Third Amendment") is made and entered into this 4th day of March, 2024 (the "Effective Date") between East Tennessee Natural Gas, LLC, a Tennessee limited liability company with its principal place of business in Houston, Texas ("Transporter") and Tennessee Valley Authority, a corporate agency of the United States created by an act of Congress with its principal place of business in Knoxville, Tennessee ("Shipper"). Transporter and Shipper are sometimes referred to herein as "Party" or collectively as the "Parties".

**WHEREAS**, the Parties entered into that certain Precedent Agreement dated August 12, 2021, as amended by the Amendment to Precedent Agreement dated December 21, 2022 and the Second Amendment to Precedent Agreement dated July 19, 2023 (collectively, the "Precedent Agreement") for the purpose of setting forth the terms and conditions according to which Transporter would install certain pipeline and/or compression facilities (including appurtenant solar facilities) and associated equipment on its system to make available the additional firm transportation capacity desired by Shipper, and Shipper would take and pay for such firm transportation service; and

**WHEREAS**, the Parties wish to amend the Precedent Agreement to further extend the dates of Shipper's conditions precedent to reflect changes in Shipper's timeframe for completion and review of Shipper's Environmental Impact Statement and make other related changes as discussed more fully herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, Transporter and Shipper hereby agree as follows:

A. Definitions. All capitalized terms used but not defined or modified herein shall have the meanings ascribed thereto in the Precedent Agreement.

B. Upon the execution of this Third Amendment, the Precedent Agreement is amended as follows:

1. Section 9(B)(i) is hereby amended by replacing [redacted]

2. Section 9(B)(ii) is hereby amended by replacing [redacted]

3. Section 10(A) is hereby amended by replacing [redacted] Also, the reference to "Board of Directors" is hereby replaced with "Board of Directors, or its delegee".

4. Section 11(B) is hereby amended by replacing [redacted]

C. Representation and Warranty. Shipper represents and warrants that its Chief Executive Officer, and his or her delegees, have been duly authorized by all necessary corporate action to enter into this Third Amendment to Precedent Agreement and following completion and satisfaction of all applicable conditions precedent within the Precedent Agreement (as amended), [redacted] has the authority to enter into, and perform its obligations pursuant to the Service Agreement and the Negotiated Rate Agreement.

D. Continuing Effect of the Precedent Agreement. All references to the Precedent Agreement shall refer to the Precedent Agreement as amended by this Third Amendment. Except as expressly amended hereby, all of the provisions of the Precedent Agreement shall remain in full force and effect and are hereby in all respects ratified and confirmed.

E. One Agreement; Counterparts; Signatures. The Precedent Agreement, as amended by this Third Amendment, will be construed as one agreement. This Third Amendment may be executed in multiple counterparts, each of which shall be deemed an original and all of which, collectively, shall be one and the same instrument. This Third Amendment may be signed by facsimile signatures or other electronic delivery of an image file (such as a .pdf file) reflecting the execution hereof, and, if so signed: (a) may be relied on by each party as if the document were a manually signed original and (b) will be binding on each party for all purposes.

F. Captions. The headings to the sections of this Third Amendment have been inserted for convenience of reference only and shall in no way modify or restrict any provisions hereof or be used to construe any such provisions.

G. Governing Law. This Third Amendment shall be governed, construed an interpreted in accordance with the federal laws of the United States of America. In the event such federal laws state no rule of decision with respect to any particular dispute or claim related to this Third Amendment, the law of the State of Tennessee, except for Tennessee's choice of law provisions, will apply.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the Parties have caused their duly authorized representatives to execute this Third Amendment, effective as of the Effective Date.

**East Tennessee Natural Gas, LLC**

By: ______________________________

Robert Huffman
President

**Tennessee Valley Authority**

By: ______________________________

Allen Clare
Senior Vice President of Power Operations